IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| The Neely Group, Inc., | ) | Case No. 24-03859 |
| Debtor. | ) | Hon. A. Benjamin Goldgar |

### NOTICE OF MOTION

TO: The attached Service List

PLEASE TAKE NOTICE that on April 15, 2024 at 9:30 a.m., I will appear before the Honorable Judge A. Benjamin Goldgar, or any judge sitting in that judge's place, **either** in courtroom 642 of the of the United States Bankruptcy Court, 219 South Dearborn Street, Chicago, or electronically as described below, and present the **DETOR'S MOTION TO ENFORCE AUTOMATIC STAY AND TO SANCTION THE UPS STORE, INC.**, a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode. Meeting ID and passcode.

The meeting ID is 161 500 0972, and the passcode is 726993.  The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

|  |  |
|---|---|
|  | The Neely Group, Inc. |
| By: | /s/Keevan D. Morgan |
|  | Its Attorney |

Keevan D. Morgan
kmorgan@morganandbleylimited.com
Morgan & Bley, Ltd.
900 W. Jackson Blvd.; Suite 4 East
Chicago, Illinois 60607
312.802.0003
Attorney No. 1958844

**Certificate of Service**

I, Keevan D. Morgan, an attorney, certify that on April 8, 2024, I served a copy of the foregoing Notice of Motion and the Motion and Exhibits referred to therein to those persons on the following at the addresses shown and in the manner set forth thereon.

Patrick S. Layng
Office of the United States Trustee
Region 11
USTPRegion11.MD.ECF@usdoj.gov

Old National Bank
arome@grglegal.com

The UPS Store, Inc.
mikegustafson@faegredrinker.com
bkurtz@lewitthackman.com

California & Armitage Main Owner LLC and
Concord & Milwaukee Owner LLC
nreid@foxswibel.com

Bitty Advance
natalie@bittyadvance.com

IOU Central Inc.
albert@tritonrecoveryllc.com
leo@tritonrecoveryllc.com
erica@tritonrecoveryllc.com

Illinois Department of Revenue
Robert.Lynch2@illinois.gov

Black Carbon Coalition, Inc.
And HNO International, Inc.,
denny@windycitytrialgroup.com

Wells Fargo Vendor Financial Services, LLC
c/o A Ricoh USA Program
Bankruptcy@Leasingconnection.com


                                               /s/Keevan D. Morgan

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Neely Group, Inc., | ) | Case No. 24-03859 |
| | ) | |
| Debtor. | ) | Hon. A. Benjamin Goldgar |

**DEBTOR'S MOTION TO ENFORCE AUTOMATIC STAY
AND TO SANCTION THE UPS STORE, INC.**

Now comes the Debtor, The Neely Group, Inc., by and through its attorney, Keevan D. Morgan of Morgan & Bley, Ltd., and moves this Honorable Court to enforce the automatic stay imposed by 11 USC § 362 and to sanction thee UPS Store, Inc. ("UPS") for its violations of the automatic stay. In support of this Motion, the Debtor states as follows:

**I. Synopsis**

The Debtor asserts that it is the owner of two UPS store franchises. UPS asserts that it terminated the franchises just before the Debtor's filing of its Petition for Relief. After the Debtor filed for relief, UPS cut the Debtor off from its shipping and mailbox rental software and UPS proprietary hardware, as well as the Debtor's access to its own financial information, on the basis that the prepetition termination was effective. However, for the reasons stated in this Motion, UPS's termination of the franchises was wrongful and its cut-offs of the Debtor's ability to conduct almost all of its regular business and to have access to its own financial information violated the automatic stay. This Motion seeks redress for UPS's violations of the automatic stay.

**II. The Debtor's Franchise Agreements with UPS and Their Wrongful Termination**

1. The Debtor is a UPS Franchisee that was operating two UPS store locations at the end of 2023. The Debtor paid $1,856,738.46 for its UPS Franchises No. 3173 and 5744 on October 22,

2022. Exhibit 1. The Debtor's sole shareholder and President, Morrel ("Steve") Neely, also invested large sums of his own to complete the purchase and take off of the Franchises. In the Debtor's original purchase of the Franchises, the lion's share of the purchase price went to a private seller, although UPS netted $272,085.09. However, with the Debtor gone, UPS can sell the Franchises again and pocket all the proceeds. In just such an attempt to take back the Franchises for nothing, immediately before the filing of the Debtor's Petition for Relief, UPS purported to terminate the Debtor's Franchises on the ground each Franchise had been late on two payments to UPS even though UPS owed the Debtor much more money than the Debtor owed UPS, and even though UPS had a security interest in, and the right to set off, its alleged debt from what it owed the Debtor.

2. More specifically, as a condition to entering both Franchise Agreements, and attached as an exhibit to each one, the Debtor was required to give UPS a blanket Security Agreement in all its assets, as follows:

> **Description of Collateral.** The Collateral covered by this Security Agreement and in which a security interest is hereby granted and transferred to Secured Party is as follows:
>
> All interests in any The UPS Store ® Center(s) or Area(s) either now owned or in which Franchisee gains rights in the future, all of Franchisee's tangible and intangible personal property comprising such Center(s) and Area(s) including, without limitation all accounts, accounts receivable, cash, cash deposits, amounts owed by other than customers, chattel paper, collateral, deposit and checking accounts, equipment (including computers, peripherals, and software), goods, instruments, inventory, note proceeds, ***royalties or sales fees owed to the Franchisee by TUPSS***,[emphasis added] stock in trade, trade receivables, contract rights, including, but not limited to, at interests in the Franchise Agreement, general intangibles, including business trade name and goodwill, and all of the above, wherever located, whether now owned or hereafter acquired, including the products and proceeds thereof, all replacements and substitutions thereof, and all additions, replacements, attachments and accessions in which Franchisee now or hereafter has an interest (the **"Collateral"**).

Exhibit 2. UPS did not file a UCC-1 Financing Statement in Illinois against the Collateral.

3. Subsequent to taking ownership of the two stores, the Debtor borrowed money from IOU Financial ("IOU"), and gave IOU a blanket security agreement in all the Debtor's assets and IOU filed a UCC-1 Financing Statement in Illinois against the Collateral. Exhibit 3.

4. On November 27, 2023, Triton Recovery Group, LLC ("Triton") on behalf of IOU, served UPS with a "UCC Notice and Notice of Power of Attorney," which Notice demanded that UPS pay to IOU all funds processed by UPS on behalf of the Debtor. Exhibit 4.

5. The Debtor's purchase of the UPS Franchises was financed by Old National Bank ("ONB"). ONB took a blanket security interest in all the Debtor's assets. On October 21, 2022, ONB filed a UCC-1 with the Illinois Secretary of State as notice of its Security Agreement. Exhibit 5.

6. On January 12, 2024, UPS asserted that the Debtor was in "material" default of its Franchise Agreements for failure to pay UPS $7,637.38 in "Royalties" regarding Franchise No. 3173, Exhibit 6, and $23,753.20 regarding Franchise No. 5744. Exhibit 7. The Debtor cured these alleged defaults within the time provided in UPS's notices of default with an opportunity to cure send by UPS on January 12, 2024.

7. However, UPS's contractual right to pay itself what it was owed from the amounts it owed the Debtor, was superior to the rights of IOU's security interest, because UPS had not yet invoiced its debt to the Debtor as an account payable and it was therefore subject to setoff. But even if the entire amount were an account payable by UPS and an account receivable to the Debtor, then under the Illinois Uniform Commercial Code, UPS's security interest was superior to IOU's, because UPS had possession the funds.

8. Upon information and belief, on February 21, 2024, ONB's attorney served UPS with a notice ("Notice") identical in form to that served upon the Debtor that ONB was "exercising its

rights and remedies as a secured lender of The Neely Group, Inc. ("The Neely Group"), and specifically informed UPS as to exactly what collateral it was intending to obtain:

> As security for the loans made to The Neely Group by ONB, The Neely Group granted ONB a security interest ***in its accounts receivable, including the amounts due and owing by you or your company to The Neely Group***.

[emphasis added] In addition, ONB's notice threatened that:

> Under no circumstances should payment be given or mailed to The Neely Group, Inc. Please notify the undersigned immediately if such a request is made. Payment to The Neely Group will not release or relieve you or your company from your obligation to pay ONB. Payment should be accompanied by a copy of the invoice submitted by The Neely Group to you.

<u>Exhibit 8</u>.

However, UPS's contractual right to pay itself what it was owed from the amounts it owed the Debtor, was superior to the rights of ONB's security interest for the same reasons that UPS's security interest and setoff right were superior to IOU's, including UPS's possession of the monies.

(810 ILCS 5/9-310)

  (b) Exceptions: filing not necessary. The filing of a financing statement is not necessary to perfect a security interest:

  (6) in collateral in the secured party's possession under Section 9-313;

  (810 ILCS 5/9-313) (from Ch. 26, par. 9-313)

    Sec. 9-313. When possession by or delivery to secured party perfects security interest without filing.

     (a) Perfection by possession or delivery. Except as otherwise provided in subsection (b), a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral.

In either case, whether due to a right to set off or a superior security interest, any declaration by UPS that the Debtor was in default in its payment to UPS was manufactured by UPS in order to create a forfeiture by the Debtor of its valuable franchise for which it relatively recently had paid $1.856 million. In addition, both IOU's and ONB's notices was wrongful, because each of them purported to compel UPS to pay monies to IOU or ONB that were subject to UPS's superior rights.

9. As of March 14, 2024, UPS had still refused to pay the Debtor any monies it owed to the Debtor or to pay itself from funds it owed to the Debtor even though that amount was at least $177,772.69 and was readily available to UPS to do so. Instead, on March 15, 2024, UPS again declared the Debtor in default on both Franchises again, this time in the amount of $22,679.99 for Franchise No. 3173, Exhibit 9, and $22,925.65 for Franchise No. 5744. Exhibit 10. In its March 15, 2024 Notices, UPS did not give the Debtor the right to cure any purported default. Rather, on March 16, 2024, UPS purported to terminate the Franchise agreement even though UPS continued to owe the Debtor at least $177,772.69. The Debtor filed its Petition for Relief under Chapter 11 on **March 18, 2024.** Shockingly for a company of its size, even after the filing of the Debtor's bankruptcy case, on March 25, 2024, when discussing cash collateral in an email from its counsel, UPS did not even know whether by its own calculations, it owed the Debtor $145,448.97 or $177,772.69:

> There are additional amounts that had been contributed to "upgrade accounts" for upgrades to the locations required under the Franchise Agreements and these total $32,323.72 ($17,193.07 @ #3173; $15,130.65 @ #5744). I do not as of yet know the legal status of these "upgrade accounts," whether they property of TUPSS or of the Debtor's.

Exhibit 11. Tellingly, that same email from UPS's counsel knocked out the very foundation of UPS's prepetition claim that the Debtor could have had any monetary default to UPS:

> TUPSS has a setoff right against the Debtor under the Franchise Agreement and applicable law and will, via motion to the Court, be seeking to exercise that right. Based on the above numbers, if the setoff is granted, there would be $93,164.19 available to be remitted to Neely Group (this does not include the "upgrade account" amounts—though as noted above, these amounts may also be property of the estate).

No such motion has been filed by UPS. However, as will be discussed below, the $32,323.72 is in fact the Debtor's property.

10. UPS's purported termination of the Debtor's Franchise Agreements was wrongful. In that regard, Illinois law has long held that a creditor may not declare a default against a debtor when the creditor owes more to the debtor than it is owed, and as the internal cite in a leading case shows, the rule is the same in California where UPS is headquartered:

> There is no default which would permit the mortgagor to accelerate the maturity of the debt when there is a set-off available which is equal to or exceeds the amount of the indebtedness due at the time of default. (*Mason v. Griffith* (1917), 281 Ill. 246, 256, 118 N.C. 18; *Smith v. Niemann* (1919), 216 Ill.App. 179, 186; see also *Hauger v. Gates* (Cal.1954), 42 Cal.2d 752, 269 P.2d 609, 610—611.) The rule is based on the reasoning that it would be inequitable to permit one by his own act to cause a partial failure of the consideration for the mortgage without requiring him to credit the amount of such failure upon the indebtedness for the purchase price of the property. *Brinton v. Johnson* (1922), 35 Idaho 656, 208 P. 1028, 1031; see also *State Bank of St. Charles v. Burr* (1939), 372 Ill. 114, 117—118, 22 N.E.2d 941; *Dunlap v. Peirce* (1929), 336 Ill. 178, 184, 168 N.E. 277; *Northern Trust Co. v. Sanford* (1923), 308 Ill. 381, 387, 139 N.E. 603; *Schmisseur v. Penn* (1892), 47 Ill.App. 278, 285.

*Chicago Title & Trust Co. v. Exchange Nat. Bank of Chicago*, 19 Ill.App.3d 565, 567 (1974).

11. The purported termination was also wrongful because the Franchise Agreement provides that UPS may terminate it "only for 'cause'." [¶ 12.2] And **"Cause"** is hereby defined as a material breach of this Agreement." [¶ 12.2] However, there was no cause.

12. Regarding its purported termination of the Debtor, UPS relied upon its "right" to terminate "without Notice or Opportunity to Cure." Specifically:

h. if Franchisee (i) fails on 2 or more separate occasions within any period of 12 consecutive months to comply with the same obligation under this Agreement, whether or not such breaches shall have been curable or cured after receipt of notice; or (ii) receives 3 or more written notices of default from TUPSS, within any period of 24 consecutive months, concerning any material breach by Franchisee, whether or not such breaches shall have been curable or cured after receipt of notice. Such repeated course of conduct shall itself be considered incurable and be grounds for termination of this Agreement at the same time as, or any time after, TUPSS notifies Franchisee of the third material default. [¶ 12.4h]

13. Paragraph 12.4h relates to a provision of the Illinois Franchise Disclosure Act, 815 ILCS 705/19, which defines "good cause" and within that definition includes a franchisee's repeated violations of a franchise agreement, although the statute does not define, "repeated":

(815 ILCS 705/19) (from Ch. 121 1/2, par. 1719)

Sec. 19. Termination of a Franchise. (a) It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for "good cause" as provided in subsection (b) or (c) of this Section.

(b) "Good cause" shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

(c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:

(1) makes an assignment for the benefit of creditors or a similar disposition of the assets of the franchise business;

(2) voluntarily abandons the franchise business;

(3) is convicted of a felony or other crime which substantially impairs the good will associated with the franchisor's trademark, service mark, trade name or commercial symbol; or

(4) *repeatedly* fails to comply with the lawful provisions of the franchise or other agreement. [emphasis added]

Here, the number of "repeated" violations was two, which is the smallest arithmetic number possible.

Page 7 of 15

14. However, that lowest arithmetic number is not legally sufficient. In *The Original Great American Chocolate Chip Cookie Company, Incorporated, v. River Valley Cookies, Limited*, 970 F.2d 273 (7th.Cir.1992), the Plaintiff franchisor brought suit against its franchisee and the franchisor requested an injunction against the franchisee's continued use of the franchisor's proprietary marks. Although the Circuit Court appeal concerned which side was entitled to an injunction, and not the merits of the underlying case regarding termination of the franchise agreement therein per se, and while the Seventh Circuit reversed the District Court's decision to grant injunctive relief to the franchisee, the Seventh Circuit discussed the "repeated violations" requirement:

> The company bases its right to cancel the agreement not on the Sigels' failure to cure their violations in timely fashion once they were brought to their attention but on the repeated violations within a 12-month period. The Sigels argue that committing a mere three violations, all that the agreement required to entitle the Cookie Company to terminate their franchise, does not necessarily equate to "repeatedly" failing to comply with the agreement. That is another question we need not decide. ***Even if the agreement violated the Franchise Disclosure Act by failing to specify some higher number, this would authorize the court, not to strike the entire provision, but only to restrict it to cases in which the franchisee's violations could fairly be described as repeated***—and here it should be pointed out that there is no 12-month limitation in the Act. If ever there was a case of "repeated" violations, it is this case."

*Id.*, at 279. [emphasis added]Despite deciding the injunction issue for Plaintiffs, the Seventh Circuit obviously took seriously, and left open for future decision, whether the "repeated" violations provision necessitate *a number greater than three* within the parties agreed time frame. In this case, the number is but two for each of the Debtor's franchises. The American Heritage Online Dictionary defines "repeated" as "Said, done, or occurring again and again: We heard repeated knocks on the door." https://www.ahdictionary.com/word/search.html?q=repeated It is not plausible that the Illinois Supreme Court would interpret, "repeated" as two.

15. Furthermore, UPS's notices to the Debtor failed because they did not specify any specific monetary default by the Debtor, but instead only generally asserted that there were such defaults under the Franchise Agreements:

> Section 5.4 of the Franchise Agreement states: ". . . it shall be a material requirement for Franchisee to pay to TUPSS, its Affiliates, designees and others promptly when due: (a) all obligations, royalties, trade accounts, promissory notes, financing agreements and equipment lease payments arising out of the operation of Franchisee's Center; (b) all lease or rental payments for Franchisee's Location; ( all amounts advanced by TUPSS or which TUPSS has paid, or for which TUPSS has become obligated to pay, on behalf of Franchisee for any reason whatsoever; (d) the amount of all sales taxes, use taxes, personal property taxes and similar taxes which shall be imposed upon Franchisee and required to be collected or paid by TUPSS . . .; (e) any amounts due on account of purchases of goods, supplies or services relating to Franchisee's Center; and (f) for re-designs by TUPSS of transferring, existing, Re-opening, or relocating Centers, and then-current Center Development Fee and Design Fee."

Exhibit 6 and 7. Not only did UPS's notices fail to describe what payments were in default, but they also failed to denote when the defaults occurred. UPS's January 12 Notices of Termination with an opportunity to cure make clear that UPS's position is that it could terminate its Franchise Agreements if a franchisee twice failed to make payments of a few hundred dollars for the rental of copy machines from UPS even where, as here, the Franchisee paid $1.856 million for the Franchises. Moreover, equity abhors forfeiture. *Miles Homes, Incorporated, of Illinois v. Mintjal*, 17 Ill.App.3d 642 (4th Dist.1974). Although contractual forfeitures are allowed where the right is clearly and unequivocally shown, and subsequent performance will not save the contract. *Id.,* at 646. However, "The foregoing notwithstanding, forfeitures are not favored by courts of equity. Purchasers will be protected against forfeiture to prevent wrong or injustice. This is especially true where the agreement is simply one for the payment of money." *Id*. Wrong and injustice are present here, because as noted above, UPS always had the right to set off and pay itself, or to enforce its superior possessory

security interest and pay itself but instead opted for to forfeit the Franchises. And, while the Franchise Agreements cover more than the mere payment of money, the declared defaults concern only the payment of money.

16. Indeed, UPS's Franchise Agreement form is so one sided, albeit apparently in line with Newton's First Digital Law: "If it's on the internet, it must be true," it allows UPS to terminate a franchise if three or more negative reviews are posted online about the Franchise within a six month period that UPS determines in its sole discretion reflect poorly on the operations and reputation of the store involved.[¶ 12(n)]

17. Moreover, UPS's termination notices add insult to injury. As discussed above regarding how much money UPS owed the Debtor, even after the Debtor filed its bankruptcy case, UPS's counsel informed the Debtor's lawyer that UPS might owe the Debtor $32,323.72 for "upgrade accounts" but he did not know if that was the case or whether the Debtor owed that sum to UPS. However, on April 5, 2024, UPS's lawyer further informed the Debtor's lawyer that UPS had determined who owed the upgrade accounts to whom, and it was UPS that owed the Debtor and that the money would be sent to the Debtor. Exhibit 12. Thus, UPS ironically cited to a Franchise Agreement clause that allowed UPS to terminate the Franchise Agreements by reason of a Franchisee's failure to pay for "(f) re-designs by TUPPS of transferring, existing, Re-opening, or relocating Centers, and then-current Center Development Fee and Design Fee[s]" even though UPS that was in default and had not paid its bill to the Debtor for $32,323.72 for that exact thing, which amount, all by itself had been enough to cover the entire alleged amounts in the first Notice of Default without even considering how much UPS owed the Debtor from normal operations. UPS had no right to terminate these Franchise Agreements, but if it ever did, equity is abhoring their forfeitures and demanding their reversals.

18. In addition, the Franchise Agreements do not specify what is the "material" amount necessary to declare a default. However, another provision of ¶ 12.4 provides some guidance:

> b. Franchisee or any of its Owners allows a judgment against it or them in the amount of more than $25,000 to remain unsatisfied for a period of more than 30 days (unless a supersedeas or appeal bond has been filed.

Besides not being a default as aforesaid because UPS owed the Debtor at all relevant times much more money than the Debtor owed UPS, the $7,637.38 alleged default was not material in relation either to the purchase price/value of the Franchise nor in relation to any other monetary defaults such as a judgment, and therefore did not constitute a default. The same goes for the $22,679.99 alleged default, and in any case, if the $7,637.38 and the $22,679.99 for the separate Franchise's alleged defaults, which were themselves not material.

### III. UPS's Violations of the Automatic Stay

19. The Debtor filed for relief under Chapter 11 on March 18, 2024 at 9:13 a.m.

20. About two hours after the Debtor filed its Petition for Relief, UPS (for lack of a better term) disconnected the Debtor from its UPS computers. Due to this disconnection, the Debtor could no longer function for the shipping part of its business, which cut down its estimated gross income from $188,000 per month to $85,000 per month. In addition, the Debtor no longer had access to its financial information related to UPS and could not verify what UPS owed it or what it owed UPS or any other information. (The "Shipping Cut-off"). After the bankruptcy case was filed, UPS's attorney described UPS's actions in implementing the Shipping Cut-off as follows:

> I inquired about the digital information you raised on our call. From my conversation with TUPSS, I now understand that these are proprietary TUPSS hardware and software platforms that are only available to franchisees. Providing access to them requires a full re-installation procedure that includes both new hardware and software steps and so cannot be effectuated quickly. However, the bigger issue would be that

access to these platforms is limited to franchisees and, absent the parties mutual decision to enter into a new franchise agreement, TUPSS will not provide access to non-franchisees (even former franchisees).

Thus, by UPS's own admission, its actions "cannot be effectuated quickly," which further aggravates the damages suffered by the Debtor due to UPS's violations of the automatic stay.

21. Moreover, without the financial information that UPS has cut-off, the Debtor will be hindered and delayed in preparing and filing complete Schedules and Statement of Financial Affairs.

22. The Debtor negotiated a cash collateral order about a week after filing its case based upon the expected reduction in gross income from $188,000 to $85,000. After the budget was agreed upon but before an order could be submitted, UPS disconnected the Debtor's on-line access to its mailbox customers information and billing data. Thereafter, the Debtor has not been able to collect its mailbox fees regarding approximately 1,000 mailbox customers. (The "Mailbox Cut-off").[1]

23. The purported Franchise Termination, the Shipping Cut-off, and the Mailbox Cut-off were all intentionally undertaken by UPS in order to force the Debtor out of business so that UPS could sell the UPS stores covered by the Debtor's franchise again to someone else or for other improper reason. This type of conduct was specifically criticized by the Seventh Circuit in the *Original Great American* case as a factor to weigh as to whether injunctive relief should be granted against a franchisor. In the *Original Great American* case, the Seventh Circuit was more favorable to the franchisor therein because it had given its franchisee the opportunity to sell the franchise

---

[1] Out of an abundance of caution, on April 3, 2024, the undersigned attempted to verify with UPS's counsel: (a) the date, (b) the time, and (c) the supporting evidence that UPS has as to when the Shipping Cut-off and the Mailbox Cut-off occurred. Exhibit 13. UPS's counsel promised to try to provide the information, and although the problem surely lies with UPS, not its very cooperative counsel, such information was not provided and the Debtor therefore relies on its own information as to same in making this Motion. Exhibit 14.

before terminating it, thereby negatively implicating the franchisee's allegation of irreparable harm. 971 F.2d at 280. UPS gave the Debtor no such opportunity, but instead moved against it at breakneck speed first to terminate the Franchise Agreements pre-bankruptcy and second, then to disable the Debtor's ability to do business with full knowledge of the automatic stay.

24. Moreover, even a brief search of the internet shows that UPS has been sued time and again by minority persons for racial and other discrimination. Mr. Neely, the Debtor's aforementioned principal, is African-American. UPS's purported termination adversely affects Mr. Neely and the Debtor's right to make contracts in violation of 42 U.S.C. § 1981 and may violate 42 U.S.C. § 1983 and other civil rights laws as well. Those are all exceptions to the Seventh Circuit's observation in Original Great American Chocolate Chip that standing alone, the fact that a franchisor treats other franchisees differently in not a defense to a breach of contract suit. *Id.,* at 279.

25. The Bankruptcy Code, 11 U.S.C. § 362(h) provides that "an individual" harmed by an intentional violation of the automatic stay is entitled to recover its damages from the violator, including punitive damages. In *In re A and C Electric Co., Inc.*, 188 B.R. 975, 979-980 (Bkrtcy.N.D.Ill.1995), the Court found that a corporation is an individual for purposes of such recovery. That holding was rejected in *Paloian v. Grupo Serla S.A. de C.V.*, 433 B.R. 19, 40-41 (N.D.Ill. 2010), and other cases have gone one way or the other on the issue, which issue, however, apparently has never been adjudicated by the Seventh Circuit and therefore remains open. For the reasons set forth in *A and C*, and because the damages to a corporation are likely to be greater than for an individual because, as here, the livelihoods of all the Debtor's employees and its equity security holder, all of whom are individuals, has been largely destroyed, resolution of the issue in favor of the corporation is the better avenue. And surely there are many individuals damages by these

violations of the automatic stay, including all of the Debtor's employees and Mr. Neely himself, who guaranteed all the obligations of the Debtor not only to UPS but to ONB, albeit they will all have to bring their own claims with their own lawyers regarding such violations.

26. Even if a corporation is not covered by §362(h), does not mean that a corporate debtor is left without recourse for stay violations. *Paloian* holds that:

> As the bankruptcy court held, and the parties do not dispute on appeal, a bankruptcy court may punish a violation of the automatic stay pursuant to its civil contempt powers codified in § 105(a). Thus, the bankruptcy court's award of damages in the exercise of its contempt powers was proper. Its punitive damage award, however, will be vacated, as punitive damages are not an appropriate sanction for civil contempt. See *Cox v. Zale Del., Inc.*, 239 F.3d 910, 916 (7th Cir.2001) (punitive damages can be awarded for criminal, but not civil, contempt, as punishment is not the purpose of civil contempt).

Even if the Court holds that punitive damages are not recoverable by the Debtor against UPS, it may still award the Debtor's actual damages. In addition, an appropriate coercive award should be imposed against UPS, payable to the Clerk of the Bankruptcy Court in an amount equal to the Debtor's anticipated daily sales of approximately $6,000 per day until the purported Franchise Termination is withdrawn, all UPS services that were cut-off are restored.

Wherefore, the Debtor, The Neely Group, Inc., prays that the Court enter an order as follows:

A. Restoring the "Shipping Cut-off" and making it fully accessible to the Debtor;

B. Restoring the "Mailbox Cut-off" and making it fully accessible to the Debtor;

C. Awarding the Debtor its actual damages;

D. Awarding the Debtor punitive damages;

E. Ordering UPS to pay $6,000 per day to the Clerk of the Bankruptcy Court until the Shipping Cut-off and the Mailbox Cut-off are restored and fully accessible to the Debtor;

F. Prohibiting UPS from any other violations of the automatic stay; and

    G. For such other and further relief in the Debtor's favor as is fair and just.

                                                                The Neely Group, Inc.
                                         By:    <u>/s/Keevan D. Morgan</u>
                                                                 Its Attorney

Keevan D. Morgan
[kmorgan@morganandbleylimited.com](mailto:kmorgan@morganandbleylimited.com)
Morgan & Bley, Ltd.
900 W. Jackson Blvd.
Suite 4 East
Chicago, Illinois 60607
312.802.0003
Attorney No. 1958844