# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Case No. 24-03859 |
| The Neely Group, Inc., | ) | Chapter 11 |
| Debtor. | ) | Hon. A. Benjamin Goldgar |
| | ) | |

## THE UPS STORE, INC.'S OBJECTION TO DEBTOR'S MOTION TO ENFORCE AUTOMATIC STAY AND TO SANCTION THE UPS STORE, INC.

The UPS Store, Inc. ("TUPSS"), by and through its undersigned counsel, hereby submits this Objection (the "Objection") to the *Debtor's Motion to Enforce Automatic Stay and to Sanction The UPS Store, Inc.* [Docket No. 24] (the "Motion") filed by The Neely Group, Inc. (as applicable, the "Debtor") and, in support thereof, respectfully submits as follows:

## PROCEDURAL BACKGROUND

1. On March 18, 2024, the Debtor, without counsel, purported to file a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Initial Petition Date"). United States Trustee ("U.S. Trustee") for the Northern District of Illinois Patrick Lyang, by and through Assistant U.S. Trustee Adam G. Brief, filed the *U.S. Trustee's Motion to Dismiss Case Pursuant to 11 U.S.C. 1112(b) and Shorten Notice* on March 18, 2024, stating that the Debtor cannot prosecute its bankruptcy case *pro se* and that "renders the filing of this case null and void." [Docket No. 3].[1]

---

[1] The Initial Petition Date vs. Amended Petition Date distinction is raised because certain actions complained of by the Debtor occurred in the interim period and there are two schools of thought on the effect of an entity filing a bankruptcy petition *pro se*. Many circuits follow the nullity rule which holds that the petition is void ab initio. *See In re Terrace Hous. Assocs., Ltd.*, 2023 WL 7030051 (Bankr. E.D. Pa. Oct. 25, 2023) (noting cases discussing the

1

2. The Debtor filed the Amended Petition signed by an attorney on March 22, 2024 (the "Amended Petition Date") [Docket No. 8].

3. On April 8, 2024, the Debtor filed its *Motion to Enforce Automatic Stay and to Sanction The UPS Store, Inc.* (the "Automatic Stay Motion") [Docket No. 24]

## SUMMARY & OVERVIEW OF PARTIES

4. TUPSS operates as a franchisor to approximately 5,250 franchised locations throughout the United States. TUPSS' franchisees (the "Franchisees") independently own and operate their locations, with no single Franchisee owning more than 22 locations. Becoming a Franchisee and operating a The UPS Store®[2] center provides an entrepreneurial opportunity as Franchisees are able to (a) benefit from The UPS Store's first in class brand name recognition and national advertising, (b) draw on TUPSS' more than 40 years of franchising experience and expertise, (c) enjoy substantial discounts and preferred partnership relationships as a result TUPSS' ongoing collective negotiations for its Franchisees, and (d) receive the limited right and license to use TUPSS' trademarks, trade dress, and proprietary and licensed software applications and services (the "TUPSS System")[3].

---

two schools of thought). The 7th Circuit has held that an entity filing a bankruptcy petition *pro se* may, in certain circumstances, correct that deficiency by subsequently retaining counsel or amending the petition. *In re IFC Credit Corp.*, 663 F.3d 315 (7th Cir. 2011).

However, there are few nuances in IFC that may be relevant in the instant case. First, the IFC court noted that it has discretion to apply the nullity rule. *Id.* at 320. Second, a sanction, such as dismissal, for violating the rule requiring business entities to file with an attorney should be proportioned to the gravity of the violation's consequences. In IFC, "there were no adverse consequences to IFC's filing error, so there was no reason to impose any sanction, let alone the sanction of dismissal." *Id.* Lastly, and most important, the court then stated that "[d]ismissal would have been proper, in order to implement the rule, had the court discovered at the outset that IFC was unrepresented." *Id.*

[2] "The UPS Store" is a registered trademark but the registered trademark symbol will not be included at each mention of the mark going forward.

[3] The specific rights and responsibilities of the TUPSS' System are defined for Franchisees in greater detail in the Franchise Agreement and its exhibits and TUPSS' System is defined as: "TUPSS' business operating methods for Centers, including copyrights; specifications for equipment, Software, fixtures and uniforms, including the

2

5. With these benefits, come certain legal obligations for Franchisees. TUPSS has distilled these obligations into a uniform Franchise Agreement, which all potential Franchisees receive, review, and agree to follow before joining the TUPSS franchise network. TUPSS owes a duty to all of its Franchisees to enforce the standards and specifications of the Franchise Agreement to help ensure that each franchise location meets the quality, appearance, and service standards that customers, vendors, and other counterparties of The UPS Store centers have come to expect and to help protect the investments made by franchisees in their franchised businesses. Adherence to a Franchisee's obligations under its Franchise Agreement is critical. When one location fails to meet its obligations and uphold the standards, it can have a significant effect on customers' impression of the brand, and thus upon the investment made by other franchisees. Similarly, where one location routinely fails to remit its franchise payments to TUPSS, it disadvantages all other locations by disproportionately diverting resources and affecting TUPSS' ability to provide the benefits to its Franchisees.

6. The Debtor is a former TUPSS' Franchisee. After buying the assets & taking assignment of the leases of two then-franchise locations from former franchisees and entering into its own Franchise Agreements with TUPSS, the Debtor ultimately proved to be a substandard owner-operator that breached its non-financial obligations on numerous occasions, failed to pay its vendors and landlord, and, on more than twelve occasions, failed to timely meet its financial obligations to TUPSS.

---

hardware, software, policies, and procedures set forth in the Data Security Requirements; defined product and service offerings for a postal, packaging, business and communication retail service center (including those made available through an E-Commerce Program, CRS Program, Customer Loyalty & Retention Program, and/or approved vendor program); standard operating and administrative procedures; management and technical training programs; and marketing and public relations programs, all as in effect and as revised from time to time." *See* Exs. A & B at § 23.

3

US.363492048.06

7.      TUPSS initially worked with the Debtor to allow it to cure its breaches of the Franchise Agreements, though over time concern grew over the Debtor's new (and repeated) breaches. <u>Exhibits C & D</u>, *also filed at* Dkt. No. 24 at ¶ 6 & Ex. 6-7. TUPSS' was further alarmed when over a three month span it was served with notices from not one, but two, different lien creditors of the Debtor, notices which asserted liability against TUPSS should TUPSS remit any amounts owed to the Debtor and which indicated to TUPSS that the Debtor may be engaging in risky financing. *Id.* at ¶¶ 4 & 8. TUPSS also worried about the disservice the Debtor may be doing to its fellow Franchisees by failing to pay vendors common to all Franchisees and failing to stay current on its leases (notably, the Debtor's landlord manages a significant amount of retail locations nationally).

8.      Ultimately, TUPSS determined it was necessary to exercise its termination rights under the Franchise Agreements—which it did properly under the terms of the Franchise Agreements and applicable state law, even providing the Debtor notice where no notice was required under the Illinois Franchise Disclosure Act. *See* 815 ILCS 705/19(c)(4) (Where the franchisee "<u>repeatedly</u> fails to comply with the lawful provisions of the franchise or other agreement," a franchisor has "good cause" for termination "<u>without</u> the requirement of notice and an opportunity to cure.") (emphasis added).

9.      Notices of terminations were received by the Debtor on March 15, 2024, three days prior to the Initial Petition Date stating the effectiveness of these terminations would occur as of the close of business on March 16, 2024, two days prior to the Initial Petition Date (the "<u>Terminations</u>"). <u>Exhibits E & F</u>, *also filed at* Dkt. No. 24 at ¶ 9 & Ex. 9-10.

10.     Importantly, and as clearly set forth in the Franchise Agreements, the Terminations also immediately terminated the Debtor's rights and licenses to use the TUPSS' System, including

4

US.363492048.06

the proprietary software and applications only available to Franchisees. Though the Debtor frames its inability to use these software programs and applications as automatic stay violations, it has failed to identify a legal, equitable, or possessory interest in the System post-Terminations such that it had an entitlement to on-going access to the TUPSS' System constitutes "property of the estate."

11. After the Terminations, which occurred pre-petition, the Debtor had no viable right to use the TUPSS' System, including TUPSS' programs and applications, and therefore the Debtor is trying to "turn back the clock" by now alleging the Neely Group's Franchise Agreements remain in full force and effect, despite the valid Terminations and despite their counsel, prior to filing its Automatic Stay Motion, inquiring if TUPSS "has an interest in **reinstating** the franchises and giving the Debtor a year to sell them as a means to resolving the matter." (emphasis added). *See* Exhibit G.

12. The Debtor is no longer a Franchisee and, accordingly, the Debtor's argument that TUPSS violated the automatic stay because the Debtor does not have access to non-estate property (that the Debtor has no right to use) must fail.

13. TUPSS is hopeful that the Debtor is able to successfully reorganize and, under the protection of the Interim Cash Collateral Order, TUPSS has provided amounts owed to the Debtor to help ensure it can continue to operate.[4] The Debtor still holds all the shipping and packaging assets it has purchased at its stores, still maintains possession of and the right to occupy its leased premises, still maintains all of the contractual relationships with its mailbox customers, and still retains all the training and knowledge for operating a retail shipping, packing, and mailbox

---

[4] As noted in ¶ B of the *Debtor's First Interim Order Authorizing Debtor the Use of Cash Collateral Pursuant To 11 U.S.C. § 363 And Granting Adequate Protection Payments* (the "Interim Cash Collateral Order") (Dkt. No. 23), TUPSS retained funds equal to those currently unpaid for which it will be moving the Court to exercise its right of setoff.

5

US.363492048.06

business that TUPSS had provided. The Debtor's assertions that it's lack of continued access to the proprietary software and applications available only to TUPSS Franchisees prevents Debtor from continuing to operate at the location is false. However, as a non-franchisee, the Debtor has no right to force TUPSS to allow it to utilize TUPSS' System, including its proprietary software and applications to run the Debtor's business.[5]

## RELEVANT FACTS & BREACHES

14. On October 19, 2022, the Debtor purchased the assets of existing franchises from franchisees Ownership Inc. and Nice Package, Inc., neither of which are affiliates of TUPSS. Dkt. No. 24 at Ex. 1. The Debtor entered into two franchise agreements with TUPSS, one for Store Number 3173 and one for Store Number 5744 (each a "Store" and together, the "Stores"), which became effective on October 19, 2022. *See* Exhibits A & B.

15. Beginning in June 2023 and continuing through February 2024, the Debtor breached §§ 5.4(a) (". . . it shall be a material requirement for Franchisee to pay TUPSS, its Affiliates, its designees, and others promptly when due: all obligations, royalties, trade accounts, promissory notes, financing agreements and equipment lease payments arising out of the operation of Franchisee's Center."), 5.1(c)-(e) (requiring payment of royalty, marketing, and advertising fees) and 5.2(b) (requiring payment by ETF) of the Franchise Agreements each time that TUPSS attempted to collect its royalty fees via the required Electronic Funds Transfer (EFT) process and was unable to do so. See collected ACH Return/NOC Reports at Exhibit H):

---

[5] On information and belief, both of the Stores continue to hold themselves out as "The UPS Stores" as the façade signage has not been removed or otherwise amended to inform customers that they are no longer TUPSS franchise, which represent an on-going violation of a post-termination obligation of the Debtor.

6

**Center 3173**

| EFT Date | Description | Amount | Deficiency |
|---|---|---|---|
| 7/20/2023 | June 2023 Royalty | $ 6,322.65 | Returned Stop payment |
| 8/1/2023 | June 2023 Royalty | $ 6,322.65 | Reprocess returned |
| 9/20/2023 | August 2023 Royalty | $ 5,617.75 | August royalty returned |
| 10/20/2023 | August & Sept 2023 Royalties | $ 10,901.32 | August & September royalties returned |
| 12/22/2023 | November 2023 Royalty | $ 6,361.71 | November royalty returned |
| 2/21/2024 | January 2024 Royalty | $ 5,638.46 | January royalty returned |

**Center 5744**

| EFT Date | Description | Amount | Deficiency |
|---|---|---|---|
| 7/20/2023 | June 2023 Royalty | $ 6,752.87 | Returned Stop payment |
| 8/1/2023 | June 2023 Royalty | $ 6,772.87 | Reprocess returned |
| 9/20/2023 | August 2023 Royalty | $ 6,849.54 | August royalty returned |
| 10/20/2023 | August & Sept 2023 Royalties | $ 13,372.36 | August & September royalties returned |
| 10/26/2023 | August & Sept 2023 Royalties | $ 13,372.36 | August & September royalties returned |
| 10/31/2023 | August & Sept 2023 Royalties | $ 13,372.36 | August & September royalties returned |
| 12/19/2023 | Aug & Sept royalties and statement of account | $ 13,748.51 | August & September royalties and statement of account returned |
| 12/22/2023 | November 2023 Royalty | $ 5,903.13 | November royalty returned |
| 2/21/2024 | January 2024 Royalty | $ 5,818.02 | January royalty returned |

16.     The Debtor breached § 12.4(a) of the Franchise Agreements ("fail[ing] to meet its financial obligations as they become due") on at least two separate occasions related to secured creditors.  First, on November 27, 2023, when Triton Recovery Group sent a lien creditor notice on behalf of IOU Financial (Exhibit I, *also filed at* Dkt. No. 24, Ex. 4) and then on February 29, 2024 when TUPSS received notice from counsel to Old National Bank ("ONB") that it was exercising its rights and remedies as a secured lender.  See Exhibit J.

17.     The IOU Financial Lien was additionally a default under TUPSS' Security Agreement which required that the Debtor obtain the prior written consent of TUPSS before

7

encumbering any collateral in which TUPSS had a security interest (*see* § 8 of <u>Exhibit K</u>, *also filed at* Ex. 2 to Dkt. No. 24) and further ensured that TUPSS maintained a first priority lien. *Id.* at § 9.

18. In addition, the Debtor again breached § 12.4(a) and, on information and belief, breached 12.4(m)(ii) when it entered default under its leases for its Stores ("fail[ing] to cure a default under the Lease within applicable cure period specified in the Lease, whether or not the landlord terminates the Lease as a result of that uncured default.")

19. Section § 12.4(a) was again breached by the Debtor pre-petition when TUPSS learned that the Debtor had failed to timely pay amounts owed to its vendor (and TUPSS affiliate) United Parcel Service. This also represented a breach under § 5.4(e) (". . . it shall be a material requirement for Franchisee to pay TUPSS, its Affiliates, its designees, and others promptly when due: any amounts due on account of purchases of goods, supplies or services relating to Franchisee's Center.")

20. As a result of the numerous foregoing defaults, TUPSS, by and through their counsel, provided written notice to the Debtor of immediate termination of the Franchise Agreements for both Stores on Friday, March 15, 2024 ("<u>Notices of Termination</u>") – the Debtor does not dispute receipt of the Notices of Termination. Dkt. No. 24 at ¶ 9. The Notices of Termination state that termination of the Franchise Agreements is effective immediately upon each Stores' close of business on Saturday, March 16, 2024. *Id.* at ¶ 9 & Ex. 9-10. Delivery of the Notices of Termination set into motion the automated process for deidentification and disassociation of prior franchises from the TUPSS System and brand.

## ARGUMENT

### A. The Franchise Agreements were Rightfully Terminated

21. The Franchise Agreements were rightfully terminated for cause. The Franchise Agreement at § 12.4(h) provides, as noted by the Debtor, that TUPSS may terminate the Franchise

8

Agreement "if Franchisee (i) fails on 2 or more separate occasions within any period of 12 consecutive months to comply with the same obligation under this Agreement, whether or not such breaches shall have been curable or cured after receipt of notice…." Moreover, § 19 of the Illinois Franchise Disclosure Act of 1987 (the "<u>Act</u>") provides that "good cause shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee… repeatedly fails to comply with the lawful provisions of the franchise or other agreement." The statute itself does not specifically define "repeatedly," though the facts here do not necessitate an analysis; however, it is important to note that Debtor's argument that "the number of 'repeated' violations was two," ignores the Parties' history.

22. Although TUPSS only specifically cited to four instances (two per Store) of late payment and nonpayment in the Notices of Termination, over the lifespan of the Franchise Agreements the Debtor routinely failed to make timely payments and failed to cooperate with or make payment to TUPSS and TUPSS' vendors. Between June 2023 and February 21, 2024, there were at least eight payments returned for bounced royalties and other charges—breaches under both payment requirements and the Franchisee Agreements' ETF requirements.

23. Notice of default or breach for each individual instance is not required for the purposes of determining whether there have been sufficient repeated failures to comply with the provisions of the Franchise Agreements. The Act expressly provides that "good cause" to terminate exists "without the requirement of notice and an opportunity to cure" in the case of repeated breaches. 815 ILCS 705/19. Accordingly, the fact that the Notices of Termination only referenced the four most recent instances of Debtor's failure to comply with the terms of the Franchise Agreements is immaterial to TUPSS' ability to lawfully, effectively, and rightfully terminate the Franchise Agreements.

24.     Section 12.7 of the Franchise Agreement sets forth that:

TUPSS' rights as stated in this [TERMINATION] Section shall be without prejudice to any other rights or remedies provided by law or under this Agreement, which include, but are not limited to, injunctive relief, damages or specific performance. TUPSS' failure to terminate this Agreement upon the occurrence of one or more of the above events shall not constitute a waiver or otherwise affect the right of TUPSS to terminate this Agreement because of any other occurrence of one or more of the events set forth above. Further, TUPSS' failure to enforce any term or condition of any other agreement (whether or not with Franchisee) or to terminate such agreement upon the occurrence of one or more of the above events shall not constitute a waiver of TUPSS' right to enforce any term or condition of or terminate this Agreement.

25.     In light of Debtor's myriad of breaches, and because both the Act and the Franchise Agreements require no notice for repeated violations. TUPSS had the right to terminate the Neely Group's Franchise Agreements with or without notice. Accordingly, and as discussed further below, Debtor, as a former Franchisee, had no rights in or to the use of TUPSS' proprietary software and applications following termination and accordingly there was no violation of the automatic stay.

### B.     **TUPSS Had No Setoff Obligation Where Competing Liens Asserted**

26.     The Debtor categorically mischaracterized TUPSS' right to set off as an obligation to offset. *See* Section 5.2(b) of the Franchise Agreement. Neither the Franchise Agreements nor any other document between Debtor and TUPSS obligates TUPSS to "pay itself what it was owed from the amounts it owed the Debtor." Dkt. No. 24 at ¶ 7. Further, where TUPSS had received not one, but two, lien creditor notices instructing TUPSS to remit payment only to the lien creditors, it was within TUPSS' discretion not to attempt a setoff, which could result in liability for TUPSS. Accordingly, there was no requirement that TUPSS "pay itself" any time that the Debtor was late on payment or Debtor's payments bounced and risk opening itself up to liability to ONB and IOU Financial.

10

### C. TUPSS' Action Did Not Violate the Automatic Stay

27. TUPSS' actions did not violate the automatic stay because the Franchise Agreements were terminated, and the de-identification process was commenced pre-petition. Accordingly, the Franchise Agreements are not property of the estate because they were terminated prior to the Initial Petition Date and therefore are not subject to the automatic stay.

28. The Notices of Termination were provided to Debtor on March 15, 2024, stating the disassociation and de-identification processes would automatically and immediately begin upon close of business on March 16, 2024. As part of the de-identification process, TUPSS' franchise consultant visited both store locations and removed all marketing materials on March 17, 2024. During the on-site visit, the consultant notified the Stores that they should get all CRS accounts processed prior to removal of TUPSS software.

29. The disassociation of Debtor's stores from the franchise only removed TUPSS proprietary software. Access to any non-TUPSS software, such as "QuickBooks" or similar programs where the Debtor stores financial information would be unaffected by the removal of TUPSS software. As for mailbox information, the Debtor still has access to, among other things, each customer's USPS Form 1583,[6] the mailbox holder contracts between the customer and the Debtor, and its copies of credit card receipts. Additionally, TUPSS allows for all Franchisees to export backup reports as needed.

30. At all times before the software and TUPSS' systems were disabled and removed from the Debtor's computers, Mr. Neely was entitled to export data from the TUPSS' system to

---

[6] United States Postal Service From PS-1583 explicitly requires that "The applicant must execute this form in the presence of the agent, his or her authorized employee, or a notary public. The agent uploads the original completed signed PS Form 1583 to the Postal Service's Commercial Mail Receiving Agency(CMRA) Customer Registration Database and **retains the completed signed copy at the CMRA business location**. The CMRA copy of PS Form 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service." A copy of this form is attached hereto as Exhibit L. Where a post office has not implemented the upload process, the applicant will submit one form and retain a copy.

US.363492048.06

maintain backups outside of the TUPSS proprietary software and applications. TUPSS cannot be penalized due to Mr. Neely's failure to timely export relevant data for continuing to operate his business post-termination.

31. A franchise agreement that is validly and effectively terminated prior to the petition date is not property of the estate. *See In re Tudor Motor Lodge Assoc., L.P.*, 102 B.R. 936, 948 (Bankr. D.N.J. 1989); *see also In re Motorcycle Excellence Group, Inc.*, 365 B.R. 370, 377 (Bankr. E.D.N.Y. 2006). As discussed above, the Franchise Agreements were rightfully terminated effective March 16, 2024. As such, the Franchise Agreements are not subject to the automatic stay and the disassociation of the Debtor's computers in their stores was not prohibited by the automatic stay.

32. The Debtor had no continuing right to the use of the TUPSS' System or software after the termination of the Franchise Agreements, as such, the contractual rights and entitlements provided under the Franchise Agreement are not property of the estate.

### D.    Incorrect and Irresponsible Factual Allegations

33. TUPSS feels compelled to call attention to certain allegations the Debtor included in the Automatic Stay Motion which were either incorrect, or incorrect, malicious, and for which no evidentiary support was provided.

34. First, the Debtor states that "The purported Franchise Termination, the Shipping Cut-off, and the Mailbox Cut-off were all intentionally undertaken by UPS in order to force the Debtor out of business so that UPS could sell the UPS stores covered by the Debtor's franchise again to someone else or for other improper reason."

35. In addition to being baseless, this statement also demonstrates a complete misrepresentation of how a franchise relationship operates. This is particularly curious as the Debtor should be well aware that TUPSS has no ability to "sell the UPS stores covered by the

12

Debtor's franchise" as the Debtor purchased the store assets from the prior franchisees, not TUPSS. TUPSS offers franchise licenses for qualified applicants, not "stores." Additionally, the leases for both of the Stores are directly between the Debtor and the Debtor's landlord. That TUPSS could somehow purport to sell assets owned by the Debtor and a location leased by the Debtor out from under the Debtor is preposterous and alleging this was occurring "intentionally" and for an "improper reason" is highly irresponsible.

36. Second, and frankly more concerning, is that the Debtor recklessly implies that termination of the Franchise Agreements, despite the Debtor's repeated breaches, was racially motivated and in violation of civil rights laws. This is a very serious allegation, and one that the Debtor states was made based on "a brief search of the internet." Dkt. No. 24 at ¶ 24. The Debtor (or its counsel) purported to find instances where TUPSS had "been sued time and again by minority persons for racial and other discrimination" yet cited not a single case nor acknowledged whether any of these lawsuits found on "the internet" had been confirmed to exist or if they did, resulted in any finding of liability, let alone liability involving racially discriminatory animus *Id.* Further, the Debtor inexplicably states that TUPSS' Terminations "may violate 42 U.S.C. § 1983"— this statute is completely inapplicable as it requires that the accused be either acting "under color" of law or at least is a willful participant in joint activity with the state or state agents and is usually reserved for claims against government employees. *See Dennis v. Sparks*, 449 U.S. 24, 29 (1980).

37. Counsel should always be a zealous advocate for their client, but in doing so, should also bear in mind their ethical obligations, particularly under Rules 3.1 and 3.3 of the Illinois Rules of Professional Conduct.

13

## **CONCLUSION**

All franchise relationships begin with the shared hope between franchisor and franchisee for a long and prosperous future together and if that always occurred, a "handshake deal" might be sufficient. But both sides know that success is not guaranteed, and so these partners have evolved to be bound by a written agreement to try to remove any ambiguity around their expectations of each other and their roles, rights, and obligations going forward. TUPSS and the Debtor entered into the Franchise Agreements for just this reason.

TUPSS was obligated to provide expertise & training, a well-known and well-respected brand, value for all The UPS Store centers by delivering pricing concessions from national vendors that no owner-operator could extract on their own, and use of a system, the TUPSS' "secret sauce" that includes a suite of proprietary software that TUPSS has spent years and countless millions of dollars developing and refining. The Debtor was obligated to operate the Stores to a level of quality and be a "good partner," keeping its financial house in order and ensuring payments in full and on time to its franchisor, its vendors, and its landlord.

TUPSS kept up its end of the bargain, though the Debtor did not when it repeatedly failed to meet its obligations. TUPSS tried to be patient, but ultimately had to make a hard decision. TUPSS cannot be a good franchisor if it is overly lenient with breaching operators whose behavior threatens the goodwill of the brand amongst the franchises' stakeholders. To do so would not be in the other Franchisees' best interests. TUPSS terminated the Franchise Agreement pre-petition following the law and the procedures of the Franchise Agreement and, as a creditor in this case, hopes for the best for the Debtor.

[Remainder of Page Intentionally Left Blank]

US.363492048.06

**WHEREFORE**, TUPSS respectfully requests that this Court enter an order denying the Debtor's Automatic Stay Motion.

Dated:   April 15, 2024

THE UPS STORE, INC.

By: */s/ Michael T. Gustafson*
Michael T. Gustafson
FAEGRE DRINKER BIDDLE & REATH LLP
320 South Canal Street, Suite 3300
Chicago, IL 60606
Telephone: (312) 569-1000
Facsimile: (312) 556-3000
Emails: mike.gustafson@faegredrinker.com

*Counsel to The UPS Store, Inc.*

US.363492048.06