Form G-3 (20240417)

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION        DIVISION

In re:  The Neely Group, Inc.                    )    Chapter  11
                                                 )
                                                 )    No. 24-03859
                                                 )
         Debtor(s)                               )    Judge A. Benjamin Goldgar

### NOTICE OF MOTION

TO:  See attached list

PLEASE TAKE NOTICE that on <u>June 3, 2024</u>, at <u>9:30</u> a.m. , I will appear before the Honorable <u>A. Benjamin Goldgar</u>, or any judge sitting in that judge's place, **either** in courtroom <u>642</u> of the Everett McKinley Dirksen United States Courthouse , 219 S. Dearborn Street, Chicago, IL 60604      **or** electronically as described below, and present the motion of <u>Old National Bank for an Order Granting Relief from the</u>      [to/for] <u>Automatic Stay to Setoff Accounts, or in the alternative,</u>, a copy of which is attached. to Dismiss or Convert Case

**Important:  Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government.  All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666.  Then enter the meeting ID and passcode.

**Meeting ID and passcode.**  The meeting ID for this hearing is <u>161 500 0972</u>, and the passcode is <u>726993</u>.  The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date.  If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

By: <u>/s/ Adam B. Rome</u>

Adam B. Rome (ARDC #6278341)
Greiman, Rome & Griesmeyer, LLC
205 W. Randolph St., Ste. 2300
Chicago, IL 60606
(312) 428-2750
arome@grglegal.com

## CERTIFICATE OF SERVICE

I, <u>April Bernath</u>                              ,

☐ an attorney, certify

    - or -

☒ a non-attorney, declare under penalty of perjury under the laws of the United States of America

that I served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method shown on <u>May 16, 2024</u>           , at <u>5:00</u>   p.m.   *

                                     *April Bermath*
                                 [Signature]

*All applicable boxes must be checked and all blanks filled in.

## SERVICE LIST

**Through the Court's CM/ECF System:**

Nicholas E Ballen on behalf of Creditor Acadia Realty Trust
nballen@foxswibel.com

Adam G. Brief on behalf of U.S. Trustee Patrick S Layng
Adam.Brief@usdoj.gov, agbrief@gmail.com

Michael T. Gustafson on behalf of Creditor The UPS Store, Inc.
mike.gustafson@faegrebd.com,
cathy.greer@faegredrinker.com,darlene.walker@faegredrinker.com,faegrebddocket@faegredrinker.com,c
huck.webber@FaegreBD.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

Keevan D. Morgan on behalf of Debtor 1 The Neely Group, Inc.
kmorgan@morganandbleylimited.com

N. Neville Reid on behalf of Creditor Acadia Realty Trust
nreid@foxswibel.com,
bkdocket@foxswibel.com;eanderson@foxswibel.com;bhenderson@foxswibel.com

Adam B. Rome on behalf of Creditor Old National Bank
arome@grglegal.com, abernath@grglegal.com

Kenneth M. Thomas on behalf of Creditor Acadia Realty Trust
kthomas@foxswibel.com,
bhenderson@foxswibel.com;docket@foxswibel.com;eanderson@foxswibel.com

**By First Class Mail:**

The Neely Group, Inc.
1658 N. Milwaukee Ave.
Chicago, IL 60647

ADP
1 ADP Blvd.
Roseland, NJ 07068

BRP LaSalle LLC
c/o Bucksbaum Retail Properties
71 S. Wacker Drive, Suite 2130
Chicago, IL 60606

Bitty Advance
1855 Griffin Road
Dania, FL 33004

Black Carbon Coalition, Inc.
42309 Winchester Road
Temecula, CA 92590

Bunzl Retail Services
8338 Austin Avenue
Morton Grove, IL 60053

CNA
151 N. Franklin Street, Floor 9
Chicago, IL 60606

Comcast
1701 JFK Blvd.
Philadelphia, PA 19103

HNO International, Inc.
41558 Eastman Drive
Murrieta, CA 92562

IOU Financial, Inc.
600 Town Park Lane, No. 100
Kennesaw, GA 30144

Illinois Department of Employment Security
Bankruptcy Unit
33 S. State Street, 10th Floor
Chicago, IL 60603

Illinois Department of Revenue
Bankruptcy Unit
P.O. Box 19035
Springfield, IL 62794

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 191001

Internal Revenue Service
Mail Stop 5014CHI
230 S. Dearborn Street, Room 2600
Chicago, IL 60604

Paychex
225 Kenneth Drive
Rochester, NY 14623

People's Gas
PO Box 6050
Carol Stream, IL 60197

ULINE
12575 Uline Drive
Pleasant Prairie, WI 53158

Wells Fargo
1738 Base Road
Macon, GA 31210

Wells Fargo Vendor Financial Services, LLC
c/o A Ricoh USA Program
Bankruptcy Administration
P.O. Box 13708
Macon, GA 31208-3708

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE NEELY GROUP, INC. | ) | Case No. 24-03859 |
| | ) | Hon. A. Benjamin Goldgar |
| Debtor. | ) | |
| | ) | |

**OLD NATIONAL BANK'S MOTION FOR ORDER GRANTING RELEIF FROM THE**
**AUTOMATIC STAY TO SET OFF ACCOUNTS, OR IN THE ALTERNATIVE, TO**
**DISMISS OR CONVERT CASE**

Old National Bank ("Old National"), by and through its attorneys, Adam B. Rome of the law firm Greiman, Rome & Griesmeyer, LLC, hereby moves (the "Motion") this Honorable Court for an order granting Old National relief from the automatic stay to set off certain accounts of The Neely Group, Inc. ("Neely Group" or "Debtor"), or in the alternative, to dismiss or convert this case. In support of this Motion, Old National respectfully states as follows:

### INTRODUCTION

1.     On March 18, 2024 (the "Petition Date"), the Debtor commenced its reorganization case by filing a Voluntary Petition for Relief (the "Petition") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1107(a) and 1108, as amended (the "Bankruptcy Code"). Debtor has continued to operate its business as Debtor in Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No creditors committee has been established.

2.     The statutory bases for the relief sought in this Motion are Sections 105, 362, 363 and 1112 of the Bankruptcy Code and Rule 4001(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.     On or about October 19, 2022, Old National extended credit to Neely Group in the original principal amount of $1,542,600.00 ("Loan"). The Loan was evidenced by that certain

1

Note dated October 19, 2022, in the principal amount of $1,542,600.00 executed by Neely Group in favor of and payable to Old National ("Note"). A copy of the Note is attached hereto and incorporated herein as **Exhibit A**.

4.      In addition, on or about October 19, 2022, Neely Group executed a Commercial Security Agreement ("Security Agreement") granting Old National a first priority security interest in all of its assets. On or about October 21, 2022, Old National filed a UCC-1 Financing Statement with the Illinois Secretary of State's Office perfecting its security interest in the assets of the Debtor ("UCC-1 Financing Statement"). Copies of the Security Agreement and UCC-1 Financing Statement are attached hereto as **Group Exhibit B**. As of the Petition Date, Debtor was indebted to Old National in the aggregate amount of $1,540,586.07. (*See,* Claim 7).

5.      Following the Petition Date, Debtor maintained two Debtor in Possession Accounts ("DIP Account") with Old National. Although, Old National has repeated requested the Debtor to consolidate the two accounts into one DIP Account, as of the date of this filing, the Debtor continues to maintain two DIP Accounts, namely account number xx2491("DIP Account 1") and xx2480 ("DIP Account 2").

6.      On April 8, 2024, this Court entered an Interim Order Granting Debtor's Motion to Use Cash Collateral until April 30, 2024. (Dkt. 29.) Since the expiration of Debtor's interim order, Debtor has not sought permission from the Court or from Old National for the continued use of cash collateral. Moreover, counsel for Old National explicitly represented to counsel for the Debtor that absent a Court order, the Debtor does not have Old National's consent to use its cash collateral.

7.      Since the expiration of Debtor's interim cash collateral order, Debtor, has not filed any type of Motion to use Old National's cash collateral. Nevertheless, Debtor continues to use

both DIP Accounts as if this Court's first interim cash collateral order was still in place.  Copies

of the account statements for both DIP Accounts dated May 15, 2024, are attached hereto, and

incorporated herein as **Group Exhibit C**.

8.      Apparently, the Debtor believes that it can continue business as usual, even though

Debtor's Cash Collateral Order terminated on April 30, 2024.  The following funds were removed

from the Debtor's DIP Accounts on the following days.

### ACCOUNT NUMBER XX2491

- On or about May 5, 2024, an amount totaling $1,957.50.

### ACCOUNT NUMBER XX2480

- On or about May 2, 2024, an amount totaling $12,750.00.

- On or about May 2, 2024, an amount totaling $644.25.

- On or about May 3, 2024, an amount totaling $13.90.

- On or about May 3, 2024, an amount totaling $2,016.49.

- On or about May 6, 2024, an amount totaling $757.11.

- On or about May 9, 2024, an amount totaling $254.55.

- On or about May 9, 2024, an amount totaling $171.45.

- On or about May 9, 2024, an amount totaling $663.80.

- On or about May 13, 2024, an amount totaling $612.91.

- On or about May 13, 2024, an amount totaling $166.22.

- On or about May 14, 2024, an amount totaling $2,400.00.

9.      Although, two of the withdrawals, one totaling $1,957.50 and another totaling

$12,750 were returned upon Old National Bank's notification to Debtor's counsel, the remaining

funds have not been returned.  Copies of correspondence from counsel for Old National to counsel

for the Debtor regarding Debtor's improper cash withdraws, are attached hereto and incorporated herein as **Group Exhibit D**.

10. Moreover, counsel for Old National has been informed that Debtor has about $14,000 in cash from operations in a safe that should immediately be deposited (and accounted for) in Debtor's DIP Account. See correspondence from Debtor's counsel attached hereto and incorporated herein as **Exhibit E**.

11. These transactions are a blatant misuse of cash collateral. Not only did the Debtor use cash collateral without the Court's permission or Old National's permission, the Debtor has been notified of his misconduct daily, but continues to blatantly disregard the bankruptcy court rules. The Debtor should not be afforded the protection of the Bankruptcy Code while refusing to comply with its procedures.

12. After Old National learned that the Debtor was improperly using its cash collateral without its approval or the Court, Old National attempted to work with the Debtor though Debtor's counsel, in a show of good faith, and without prejudice to the rights of Old National to object to Debtor's unauthorized use.

13. Even after Debtor was notified by Old National of its improper use, neither the Debtor nor counsel for the Debtor has sought the consent of Old National for the use of cash collateral, nor has Debtor sought Court approval. The Debtor just continues to operate its business as if it is under no restraints, under the misguided assumption that it can continue to use cash collateral without approval, either from Old National or the Court. *See,* Ex. C.

### RELIEF REQUESTED

14. For the reasons set forth herein, Old National respectfully requests relief from the automatic stay in order to set off the amounts contained in the DIP Accounts, as well as court

approval to stop payment on any pending or future transactions, and to place a "stop payment" hold on Debtor's DIP Accounts.

## BASIS FOR RELIEF REQUESTED

15.     Section 363(a) of the Bankruptcy Code defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents whenever acquired in which the estate and an entity of the estate have an interest ..." Clearly, the DIP Accounts at Old National constitute cash collateral.  Section 363(c)(2) of the Bankruptcy Code provides that the debtor may not use, sell or lease cash collateral unless each entity with an interest in such cash collateral consents, or the court, after notice and a hearing, authorizes such use, sale or lease.

16.     Old National, being the senior-secured creditor of Debtor and possessing a blanket lien on all the assets of the Debtor, has an interest in the cash collateral of Debtor.  Debtor has continued to use cash collateral after the Petition Date without obtaining Court approval or consent of Old National, and obviously giving no attention whatsoever to the concept of "adequate protection."   As set forth in *Freightliner Market Dev. v. Silver Wheel Freightlines*, 823 F.2d 362, 368-369 (9th Cir. 1987), implied consent of a secured creditor for the use of cash collateral is not deemed sufficient.  In this case, Old National has neither implicitly nor directly consented to the use of its cash collateral.  In fact, Old National has explicitly represented to Debtor that it does not have its consent to use its cash collateral.

## RELIEF FROM STAY

17.     Under Section 362(d)(1) of the Bankruptcy Code, the Court shall grant relief from the automatic stay for cause, including the lack of adequate protection of an interest in property of such party in interest. While the creditor in seeking relief from stay under Section 362 of the Bankruptcy Code bears the burden of proof with respect to the issue of the Debtor's lack of equity

in the property under Section 362(d)(2)(A), the Debtor bears the burden on all other aspects of Section 362 including adequate protection. *See* 11 U.S.C. § 362(g); *In re St. Peter's School*, 16 B.R. 404, 408 (Bankr. S.D.N.Y. 1982); *In re Boomgarden*, 780 F.2d 657, 663 (7th Cir. 1985); *In re Cobb*, 56 B.R. 440, 442 n.2 (Bankr. N.D. Ill. 1985) ("It is clearly the debtors' burden to show that [the creditor] is adequately protected. If the debtors fail to sustain that burden the stay will be lifted.").

18.     As noted above, Old National has a perfected interest in cash collateral. The Debtor has continued to use cash collateral without the consent of Old National or court approval. Further, Debtor has not provided adequate protection to Old National for the use of cash collateral. Section 361 of the Bankruptcy Code governs how adequate protection may be afforded to a secured creditor. Section 361 provides that adequate protection of an interest in property required under Sections 362 and 363, may be afforded by either 1) requiring the Debtor to make a cash payment or periodic cash payments to the secured creditor; 2) providing additional or replacement liens; or 3) granting such other relief as may be necessary to compensate the secured creditor for the use of its cash collateral. The Court has broad authority under Sections 105(a) and 362(d) of the Bankruptcy Code to remedy violations of the use of cash collateral.

19.     Debtor has not provided any form of adequate protection for its unauthorized use of cash collateral. Based upon the failure of Debtor to provide adequate protection, the Court has authority under Sections 105(a) and 362(e) to lift the automatic stay in order to allow Old National to: (i) set off against the two accounts by the Debtor at Old National; (ii) stop payment of current and future unauthorized transactions; and (iii) to place a "stop payment" hold on both DIP Accounts unit further order of the Court.

### DISMISSAL OR CONVERSION OF CASE

20.     Alternatively, Old National respectfully requests that the Court enter an Order dismissing or converting this case pursuant to Section 1112(b)(1) of the Bankruptcy Code.  This section provides that upon request of a party in interest and after notice and hearing, the Court shall dismiss the case, if the movant establishes cause.  Section 1112(b)(4)(D) of the Bankruptcy Code provides that cause includes unauthorized use of cash collateral substantially harmful to one or more creditors.

21.     As set forth above, it has been clearly shown that Debtor has blatantly, without obtaining Court approval or the consent of Old National, used cash collateral since the Petition Date in complete derogation of Section 363 of the Bankruptcy Code to the detriment of Old National.  The Court, therefore, has authority under Section 1112(b)(1) of the Bankruptcy Code to dismiss or convert this proceeding.

### CONCLUSION

22.     It is clear from the foregoing that Debtor has completely disregarded the requirements set forth in Section 362 of the Bankruptcy Code for the use of cash collateral.  The Debtor, after the termination of its interim cash collateral order, continued to convert cash collateral in violation of Section 362(c)(2) without either court approval or the consent of Old National.

23.     Debtor's actions are more than sufficient to allow the Court to issue an order lifting the automatic stay to allow Old National to offset against the funds contained in the Debtor's DIP Accounts, as well as authorizing Old National to stop payment on all current and future transactions, and to place a "stop payment hold" on Debtor's DIP Accounts.  In the alternative, the actions of Debtor justify the Court dismissing or converting of this case under Section 1112.

**WHEREFORE**, Old National Bank respectfully requests that the Court enter an Order:

A.      Granting Old National Bank relief from the automatic stay to set off funds in Debtor's DIP Accounts.

B.      Authorizing Old National Bank to stop payment on all current and future transactions made upon Debtor's DIP Accounts;

C.      Authorizing Old National Bank to place a "stop payment hold" on Debtor's DIP Accounts;

D.      Requiring the Debtor to deposit its $14,000 of cash into Debtor's DIP Account;

E.      In the alternative, dismissing or converting the case; and

F.      For such other further relief as the Court deems appropriate and just.


Dated:  May 15, 2024                Respectfully submitted,

OLD NATIONAL BANK

By:/s/ Adam B. Rome_____
        One of its Attorneys

Adam B. Rome (ARDC No. 6278341)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
arome@grglegal.com

# EXHIBIT A



# U.S. Small Business Administration
## NOTE

| | |
|---|---|
| SBA Loan # | **43660991-03** |
| SBA Loan Name | **THE NEELY GROUP, INC.** |
| Date | **10-19-2022** |
| Loan Amount | **$1,542,600.00** |
| Interest Rate | **7.15%** |
| Borrower | **THE NEELY GROUP, INC.** |
| Operating Company | **THE NEELY GROUP, INC.** |
| Lender | **OLD NATIONAL BANK** |

**1.PROMISE TO PAY:**

In return for the Loan, Borrower promises to pay to the order of Lender the amount of **One Million Five Hundred Forty-two Thousand Six Hundred and 00/100** Dollars , interest on the unpaid principal balance, and all other amounts required by this Note.

**2.DEFINITIONS:**

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

**3.PAYMENT TERMS:**

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate is **7.15%** per year. The interest rate may only be changed in accordance with SOP 50 10.

Borrower must pay principal and interest payments of **$18,078.30** every month beginning **two months** from the month this Note is dated; payments must be made on the **first calendar day** in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable **10** years from **date of Note**.

**Late Charge:** If a payment on this Note is more than **10** days late, Lender may charge Borrower a late fee of up to **5.00%** of the unpaid portion of the regularly scheduled payment.

**4.DEFAULT:** Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

**5.LENDER'S RIGHTS IF THERE IS A DEFAULT:** Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

**6.LENDER'S GENERAL POWERS:** Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

**7.WHEN FEDERAL LAW APPLIES:** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**8.SUCCESSORS AND ASSIGNS:** Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

**9.GENERAL PROVISIONS:**

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G.   To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor.  Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.STATE-SPECIFIC PROVISIONS:
   NONE


11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER:

THE NEELY GROUP, INC.

By _____
    Morrell Neely, President of THE NEELY
    GROUP, INC.

# EXHIBIT B

*020006701316%10192022%0235%#########*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,542,600.00 | 10-19-2022 | 11-01-2032 | 20006701316 | 220 / 80 | | BHJ | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

| Grantor: | THE NEELY GROUP, INC.<br>2020 N CALIFORNIA AVE<br>CHICAGO, IL  60647 | Lender: | OLD NATIONAL BANK<br>810 Chicago Metro Bus Banking<br>8750 W BRYN MAWR, STE 1300<br>Chicago, IL  60631<br>(800) 731-2265 |
|---|---|---|---|

THIS COMMERCIAL SECURITY AGREEMENT dated October 19, 2022, is made and executed between THE NEELY GROUP, INC. ("Grantor") and OLD NATIONAL BANK ("Lender").

**GRANT OF SECURITY INTEREST.**  For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.**  The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All personal property of every kind and nature, wherever located, whether now owned or hereafter acquired or arising, whether jointly or severally owned, including all goods (including inventory, equipment, farm products, consumer goods and any accessions thereto), fixtures, documents, instruments (including promissory notes), accounts (including health care insurance receivables), securities and all other investment property, supporting obligations, chattel paper (whether tangible or electronic), commercial tort claims, deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), and all general intangibles (including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, copyrights, copyright applications, software, service marks, goodwill, licenses, permits and agreements of every kind utilized in the business), all records of any kind relating to the foregoing, together with all cash proceeds, non-cash proceeds and products thereof, additions and accessions thereto, replacements and substitutions thereof. This Agreement covers, and is intended to cover, all assets.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.**  In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest.  Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral.  Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.  This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender.  Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (1)  change in Grantor's name;  (2)  change in Grantor's assumed business name(s);  (3)  change in the management of the Corporation Grantor;  (4)  change in the authorized signer(s);  (5)  change in Grantor's principal office address;  (6)  change in Grantor's state of organization;  (7)  conversion of Grantor to a new or different type of business entity; or  (8)  change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender.  No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation.  The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

Enforceability of Collateral.  To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral.  There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral.  Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above, or at the location specified in the Collateral definition in this Agreement, or at such other locations as are acceptable to Lender.  Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 20006701316

Page 2

locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default,

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 20006701316                                                                                         Page 3

Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 20006701316                                                                                     Page 4

---

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**COLLATERAL INSPECTION/APPRAISAL COST REIMBURSEMENT.** Upon such frequency as Lender may determine and whether or not Borrower or Grantor is in default, Lender shall be entitled to perform and Grantor shall cooperate with examinations, inspections, audits and appraisals as provided herein. Grantor shall maintain complete and accurate books and records with respect to Collateral. Upon advance notice by Lender to Grantor, Grantor shall permit access thereto by Lender and by Lender's designated representatives and agents for purposes of inspection, copying and/or auditing. Lender and Lender's designated representatives and agents shall also have the right upon advance notice to examine, inspect and/or appraise any Collateral wherever located. Subject to any limitations under applicable law, Grantor shall reimburse Lender for any professional fees or other expenses incurred by Lender in connection with any examinations, inspections or audits of the books and records of Grantor and/or any examinations, inspections and/or appraisals of the Collateral.

**COUNTERPARTS.** This document may be executed in counterparts, each of which, when so executed, may be considered an original.

**SBA LOAN.** The loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notices, foreclosing liens, and other purposes. By using these procedures, SBA does not waive federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Illinois.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cook County, State of Illinois.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means THE NEELY GROUP, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral

**COMMERCIAL SECURITY AGREEMENT**
(Continued)

Loan No: 20006701316      Page 5

Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means THE NEELY GROUP, INC..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means OLD NATIONAL BANK, its successors and assigns.

**Note.** The word "Note" means the Note dated October 19, 2022 and executed by THE NEELY GROUP, INC. in the principal amount of $1,542,800.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 19, 2022.

GRANTOR:

THE NEELY GROUP, INC.

By: _____

MORRELL S. NEELY, PRESIDENT of THE NEELY GROUP, INC.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

RECEIVED

IL SECRETARY OF STATE

UNIFORM COMMERCIAL CODE

20221021    0834

$20.00    Electronic

**28989652**                    **FS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company                    800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
FilingDept@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703
USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| THE NEELY GROUP, INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2020 N CALIFORNIA AVE | CHICAGO | IL | 60647 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OLD NATIONAL BANK | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 8750 W BRYN MAWR, STE 1300 | Chicago | IL | 60631 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All personal property of every kind and nature, wherever located, whether now owned or hereafter acquired or arising, whether jointly or severally owned, including all goods (including inventory, equipment, farm products, consumer goods and any accessions thereto), fixtures, documents, instruments (including promissory notes), accounts (including health care insurance receivables), securities and all other investment property, supporting obligations, chattel paper (whether tangible or electronic), commercial tort claims, deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), and all general intangibles (including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, copyrights, copyright applications, software, service marks, goodwill, licenses, permits and agreements of every kind utilized in the business), all records of any kind relating to the foregoing, together with all cash proceeds, non-cash proceeds and products thereof, additions and accessions thereto, replacements and substitutions thereof. This Agreement covers, and is intended to cover, all assets.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
BR 810 1316 AMR [242295454]

**FILING OFFICE COPY — UCC FINANCING STATEMENT** (Form UCC1) (Rev. 04/20/11)

# EXHIBIT C

Activity for The Neely Group DDA # ████ 2491 from 5/1/24 through 5/14/24

| THE NEELY GROUP INC | Bal as of 4-30-24 | | 2,345.42 |
| --- | --- | --- | --- |
| DEBTOR IN POSSESSION | +Dep/CR | 2 | 14,707.50 |
| 540 N DEARBORN ST UNIT 101232 | -Chks/DR | 1 | 1,957.50 |
| CHICAGO IL 60610-1988 | -Service charge | | .00 |
| | +Interest paid | | .00 |
| | Current balance | | 15,095.42 |

| Eff Dt | | | Str/Run/Bat/Seq# | |
| --- | --- | --- | --- | --- |
| 050324 | 080 | CUSTOMER WITHDR | -1957.50 | 387.92 |
| 050824 | 010 | DEPOSIT | 1957.50 | 2345.42 |
| 050724 | 010 | DEPOSIT | 12750 00 | 15095.42 |

Activity for The Neely Group DDA # █████ 2480 from 5/1/24 through 5/14/24

```
THE NEELY GROUP INC              Bal as of  4-30-24              23,221.82
DEBTOR IN POSSESSION             +Dep/CR                              .00
548 N DEARBORN ST UNIT 181232    -Chks/DR          11           20,450.88
CHICAGO IL 80610-1889            -Service charge                      .00
                                 +Interest paid                      .00
                                 Current balance                 2,771.14
```

```
050224        080 CUSTOMER WITHDR      -12750.00        10471.82
050224        061 CRD PUR 322804        -644.25          9827.57
050324        345 CRD PUR 888100         -13.90          9813.67
050324        058 PAYCOR INC.          -2016.49          7797.18
050624        058 PAYCOR INC.           -757.11          7040.07
050824        061 CRD PUR 558300        -254.55          6785.52
050924        061 CRD PUR 855221        -171.45          6614.07
050924        345 CRD PUR 757652        -663.80          5950.27
```

```
051324        345 CRD PUR 502089        -612.91          5337.36
051324        058 PAYCOR INC.           -166.22          5171.14
051424        080 CUSTOMER WITHDR      -2400.00          2771.14
```

# EXHIBIT D

**Adam Rome**

| | |
|---|---|
| **From:** | Adam Rome |
| **Sent:** | Monday, May 6, 2024 9:14 AM |
| **To:** | Keevan Morgan |
| **Cc:** | April Bernath |
| **Subject:** | Neely |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Keevan,

Your client removed $1,957.50 from his DIP account without Court approval.   Please have you client return the funds ASAP.  If the funds are not returned the Bank will have no choice but to file the appropriate motion.

Thanks – Adam



**GREIMAN, ROME & GRIESMEYER, LLC**
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

**Adam Rome**

| | |
|---|---|
| **From:** | Adam Rome |
| **Sent:** | Tuesday, May 7, 2024 8:49 AM |
| **To:** | Keevan Morgan |
| **Cc:** | April Bernath |
| **Subject:** | Neely |

Kevan,

Your client returned the $1,957.50 back to his DIP account.  However, he has taken an additional $16,181.75 from the account since the termination of the Cash Collateral Order.   These funds must be returned ASAP.  Also, the Debtor has two DIP accounts: (i) account No. xx2491; and (ii) account xx2480, please have him combine the two accounts and close one.

Please be advise that if these funds are not returned, ONB will file the appropriate Motion.

Thanks – Adam



**GREIMAN, ROME & GRIESMEYER, LLC**
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

**Adam Rome**

| | |
|---|---|
| **From:** | Adam Rome |
| **Sent:** | Thursday, May 9, 2024 12:38 PM |
| **To:** | Keevan Morgan |
| **Cc:** | April Bernath |
| **Subject:** | Neely |

Keevan,

Your client continues to use the DIP account.  Two more transactions were made out of account 2480 last night.

Please advise.

Adam

## GRG
**GREIMAN, ROME & GRIESMEYER, LLC**
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

## Adam Rome

**From:** Adam Rome
**Sent:** Friday, May 10, 2024 8:59 AM
**To:** Keevan Morgan
**Cc:** April Bernath
**Subject:** Neely

Keevan,

Another transaction in account number xx2480 for $663.80 was debited yesterday.   I will not be able to hold back the Bank's Motion much longer.   Your client needs to return the funds and stop using the Bank's cash collateral.

Adam



## GREIMAN, ROME & GRIESMEYER, LLC
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

**Adam Rome**

---

**From:** Adam Rome
**Sent:** Monday, May 13, 2024 9:48 AM
**To:** Keevan Morgan
**Cc:** April Bernath
**Subject:** Neely Group

Keevan,

Two more withdrawals posted over the weekend.  One for $612.91 and another for $166.22.  The Debtor does **not** have ONB's permission to use its cash collateral.

Adam



**GREIMAN, ROME & GRIESMEYER, LLC**
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

## Adam Rome

| | |
|---|---|
| **From:** | Adam Rome |
| **Sent:** | Wednesday, May 15, 2024 9:41 AM |
| **To:** | Keevan Morgan |
| **Cc:** | April Bernath |
| **Subject:** | Neely |

Keevan,

Your client withdrew another $2,400 yesterday.  Please know that I am done sending you daily emails, because it does not seem to change your client's behavior.  The Bank has been more than patient, and it will now have no choice but to bring the appropriate Motion.

Adam



**GREIMAN, ROME & GRIESMEYER, LLC**
business advisors. litigation professionals.

**Adam B. Rome**
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Direct: (312)428-2740
Fax: (312)332-2781
Cell: (847)373-7663
arome@grglegal.com
www.grglegal.com

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

# EXHIBIT E

**Subject:**         FW: Neely Group [IMAN-IMANAGE.FID284567]

---

**From:** Keevan Morgan <kmorgan@morganandbleylimited.com>
**Sent:** Monday, May 6, 2024 5:35 PM
**To:** Adam Rome <arome@grglegal.com>
**Subject:** Re: Neely Group [IMAN-IMANAGE.FID284567]

***WARNING EXTERNAL MESSAGE***
Adam:

Some updates.

I think there are two DIP accounts, and the other one has about $7,000 in it.

The Debtor also withdrew cashier's checks for the landlord payments of about $12,750, but has not negotiated them because of the cash collateral issue.

In addition, I am informed that the Debtor has about $14,000 in cash from operations in a safe, and that should be brought to the bank other than whatever is needed for normal operations.

Keevan