UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Case No. 24-03859 |
| The Neely Group, Inc., | ) | Chapter 11 |
| Debtor. | ) | Hon. A. Benjamin Goldgar |
| | ) | |

**THE UPS STORE, INC.'S SUR-RESPONSE TO
DEBTOR'S MOTION TO ENFORCE AUTOMATIC STAY
AND TO SANCTION THE UPS STORE, INC.**

The UPS Store, Inc. ("TUPSS"), by and through its undersigned counsel, hereby submits this Sur-Response (the "Sur-Response") to the *Debtor's Motion to Enforce Automatic Stay and to Sanction The UPS Store, Inc.* [Docket No. 24] (the "Stay Motion") filed by The Neely Group, Inc. (as applicable, the "Debtor") and, in support thereof, respectfully submits as follows:

**PROCEDURAL & FACTUAL BACKGROUND**

1. On April 8, 2024, the Debtor filed its Stay Motion. In response thereto, TUPSS filed its *Objection to Debtor's Motion to Enforce Automatic Stay and to Sanction The UPS Store, Inc.* [Docket No. 33] (the "Objection") on April 15, 2024.

2. This Court held an initial hearing on the Debtor's Stay Motion on April 15, 2024. Two weeks later, the Debtor filed its *Reply in Support of its Motion to Enforce Automatic Stay and to Sanction The UPS Store, Inc.* [Docket No. 43] (the "Debtor's Reply").

3. An emergency hearing was scheduled for May 7, 2024 (the "May 7 Hearing") following the filing of *TUPSS' Emergency Motion to Lift Stay to Take Custody and Process Customer Packages and Cover Branded Signage* [Docket No. 48] (the "Emergency Motion") which TUPSS filed immediately after learning about hundreds of UPS packages collected and held by the Debtor since the Petition Date in its two locations. After multiple days of negotiations, the

1

DMS_US.363928177.7

Parties brokered a deal whereby the Debtor released the packages to UPS, resulting in a withdrawal of the Emergency Motion and mooting the need for the May 7 Hearing.

4. At the request of the Court, counsel to TUPSS and the Debtor did appear before the Court on May 7, where the Court requested additional briefing on the Stay Motion, specifically requesting that TUPSS file a sur-response by May 21, 2024, followed by the Debtor's sur-reply by May 31, 2024, and rescheduled the hearing on the Stay Motion for June 17, 2024. *See* Docket No. 57. The Court requested TUPSS' sur-response expand on (i) how the Court should view the term "repeatedly" in the context of the Debtors' breaches of the Franchise Agreements[1], and (ii) setoff of mutual debts.

5. TUPSS incorporates all facts in the Objection as if set forth fully herein.

## ARGUMENT

### A. The Illinois Franchise Disclosure Act Applies to this Dispute

6. The Court has asked whether the Illinois Franchise Disclosure Act ("IFDA" or the "Act") or the California Franchise Relations Act ("CFRA") is applicable here in light of the California choice of law provision in the Franchise Agreements. The IFDA applies. *See* IFDA, 815 ILCS 705/4 ("[a]ny provision in a franchise agreement that designates jurisdiction or venue in a forum outside of this State is void, provided that a franchise agreement may provide for arbitration in a forum outside of this State."); Hengel, Inc. v. Hot 'N Now, Inc., 825 F. Supp. 1311, 1316–17 (N.D. Ill. 1993)(the "anti-waiver" provision of the IFDA (815 ILCS 705/41) "represents a fundamental policy which invalidates contractual choice of law in the franchise context.")

7. As detailed in the Objection, even if subject to the CFRA instead of the Act, the Debtor's multiple breaches and TUPSS' termination response would result in the same ultimate

---

[1] Capitalized terms not defined herein shall carry such definitions assigned in the Objection.

conclusion. Section 20021 (g) of the CFRA provides that immediate notice of termination, without an opportunity to cure, is reasonable if "[t]he franchise repeatedly fails to comply with one or more requirements of the franchise, whether or not corrected after notice."

8. As discussed more fully below and in the Objection, TUPSS' actions were appropriate in light of the multitude of Debtor's breaches and the facts here more than satisfied any plausible reading of the "repeatedly" requirement (in both the IFDA and the CFRA). Accordingly, TUPSS' actions would be deemed reasonable under either statute.

B. **"Repeated," as used in Section 19(c)(4) of the IFDA, Means "More Than Once"**

9. The Debtor asserts in ¶ 13 of the Stay Motion that "Here, the number of 'repeated' violations was two . . ." and then argues that two is "not legally sufficient" to meet the definition of "repeatedly" as used in § 19(c)(4) of the Act. The Debtor does not however venture a proposed interpretation for the word "repeatedly;" that is, exactly how many times a franchisee must fail to comply with a franchise agreement for those failures to be "repeated," but Debtor states it is "not plausible" that the Illinois Supreme Court would interpret it as two. *See* Stay Motion at ¶ 14. The Debtor's proposed interpretation of § 19 of the IFDA is incorrect.

10. "In considering issues of state law, bankruptcy courts should first look to the highest court of the state for binding or direct precedent. MindGames, Inc. v. Western Publishing Co., 218 F.3d 652, 655–56 (7th Cir. 2000). In the absence of any direct authority, this Court must predict how the Supreme Court of Illinois would interpret the Illinois statute. Adams v. Catrambone, 359 F.3d 858, 862 (7th Cir. 2004). In doing so, the basic task 'is to ascertain and give effect to the intent of the legislature.' People v. Donoho, 788 N.E.2d 707, 715 (Ill. 2003). The best evidence of legislative intent is the text of the statute itself, which should be applied according to its plain and ordinary meaning unless doing so would lead to absurd results. *Id.*; *see*

3

*also* Croissant v. Joliet Park Dist., 566 N.E.2d 248, 251, (1990)." In re Awayda, 574 B.R. 692, 698 (Bankr. C.D. Ill. 2017).

11. Accordingly, we begin with the Act itself. *See* People v. Lemons, 191 Ill. 2d 155, 159 (Ill. 2000) ("The cardinal rule of statutory construction is to ascertain and give effect to the plain meaning of a statute, and that inquiry begins with the language of the statute itself.") (*quoting* People v. Hare, 119 Ill.2d 441, 447 (1988)). The Illinois Supreme Court has held that "[t]he fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning." Chapman v. The Chi. Dep't of Fin., 220 N.E.3d 1080, 1085 (Ill. 2023) (*quoting* Int'l Ass'n of Fire Fighters, Loc. 50 v. City of Peoria, 193 N.E.3d 1208, 1213 (Ill. 2022)). "The language of the statute is the best indication of the legislature's intent and therefore must be given its plain and ordinary meaning." Krautsack v. Anderson, 861 N.E.2d 633, 647 (Ill. 2006). If the language is unambiguous, the statute must be given effect without the use of other aids of construction. *Id*. at 643. We cannot 'depart from the plain language of the statute by reading into it exceptions, limitations, or conditions not expressed by the legislature.' In re Michelle J., 808 N.E.2d , 992 (Ill. 2004). A court should not consider words and phrases in isolation, but instead should interpret each word and phrase in light of the statute as a whole. Krautsack, 861 N.E.2d at 643. 'Each word, clause and sentence of a statute must be given reasonable meaning, if possible, and should not be rendered superfluous.' Standard Mutual Insurance Co. v. Lay, 989 N.E.2d 591, 598 (Ill. 2013). Statutes should be interpreted as a whole, "meaning different sections of the same statute should be considered in reference to one another so that they are given harmonious effect." Jayko v. Fraczek, 966 N.E.2d 1121, 1131 (Ill. App. Ct. 1st Dist. 2012); Wolf v. Toolie, 19 N.E.3d 1154, 1159 (Ill. App. Ct. 1st Dist. 2014).

4

12. The Debtor ignores the full text of 815 ILCS 705/19 and proposes to interpret the word "repeatedly" in isolation using an online dictionary (the American Heritage Online Dictionary), which defines "repeatedly" as "[s]aid, done, or occurring again and again." Stay Motion at ¶ 14. As a threshold matter, when someone does something more than once, it would not be incorrect to say he has done it "again and again." Indeed, the Oxford English Dictionary, defines "repeatedly" as "more than once, again and again; frequently." Repeatedly, THE OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/repeatedly_adv?tab=meaning_and_use#25815420 (last visited May 16, 2024). As stated, the Debtor does not offer its own proposed interpretation of what "repeatedly" or "again and again" means—leaving us to guess whether is it necessary for something to happen three times to be "repeated" or "again and again"? Or perhaps more than three times? The notion that the Illinois Legislature used the word "repeatedly" in section 19(c)(4) to have an ambiguous meaning of "again and again" is illogical. The most reasonable interpretation of the word "repeatedly" in section 19(c)(4), based on the various dictionary definitions, is "more than once."

13. But even if the word "repeatedly" were ambiguous, the full text of 815 ILCS 705/19 makes it clear that the most reasonable interpretation of the statute is that a franchisor has good cause to terminate a franchise agreement if (1) a franchisee fails to cure a default in a reasonable period of time after the franchisor gives notice of the default, or (2) if the franchisee fails to comply with the terms of the franchise agreement more than once, in which circumstances the franchisor is not required to give notice and an another opportunity to cure. 815 ILCS 705/19 provides:

> (a) It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for "good cause" as provided in subsection (b) or (c) of this Section.

5

(b) "Good cause" shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

(c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:

    (1) makes an assignment for the benefit of creditors or a similar disposition of the assets of the franchise business;

    (2) voluntarily abandons the franchise business;

    (3) is convicted of a felony or other crime which substantially impairs the good will associated with the franchisor's trademark, service mark, trade name or commercial symbol; or

    (4) repeatedly fails to comply with the lawful provisions of the franchise or other agreement.

14.    Section 19(b) thus establishes "good cause" for termination exists related to a <u>single</u> failure to comply with a lawful provision of the franchise agreement when notice has been provided and no cure has occurred during a reasonable period provided for such purpose. Section 19(c)(4) by contrast deals with the situation where a franchisee fails to comply with the franchise agreement more than once—in which case the franchisor has good cause to terminate without giving the franchisee notice and another opportunity to cure.

15.    If the Court were to adopt the Debtor's contention about repeatedly that "good cause" under § 19(c) requires "more than two" failures to comply, then this would create an uncertainty about a franchisor's rights and duties under the Act when a franchisee violates a franchise agreement a second time. Is the franchisor obligated to give notice and another opportunity to cure before exercising its contractual rights to terminate? Again, the most reasonable interpretation of 815 ILCS 705/19 is that 19(b) deals with one default, and 19(c) deals with more than one default.

16.     TUPSS' proposed interpretation is also supported by other Illinois legislation which shows that the Illinois legislature knew how to draft legislation to unambiguously mean "more than two."  The Illinois legislature has employed the phrases "three or more" or "at least three" in more than thirty-nine (39) laws in the Illinois Combined Statutes, s*ee, e.g.,* 405 ILCS 125/32[2], 410 ILCS 235/2[3], and 820 ILCS 405/607[4].

17.     Additionally, the Illinois legislature uses the term "repeatedly" in 30 statutes including the Act, showing the legislature's intention that "three or more" and "repeatedly" are to have different meanings and the use of "repeatedly" instead of "three or more" in the Act was not a mere accident or fluke.  Notably, in 105 ILCS 5/27-24.5, the Legislature used "more than once" to expand on its use of "repeated."  ("The State shall not reimburse any district for any student who has **repeated** any part of the course **more than once** or who did not meet the age requirements of this Act during the period that the student was instructed in any part of the drivers education course.")

18.     The Debtor incorrectly relies upon *The Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273 (7th Cir. 1992) to support its proposed interpretation of "repeatedly" as meaning at least three violations.  Debtor admits that the court in that case declined to make a determination on the question of the precise threshold created by the

---

[2] Defining "Individual at high risk of overdose" as someone who is homeless and who as had "(A) **three or more** hospital inpatient or inpatient detoxification admissions for a substance use disorder within the most recent 12-month period; (B) **three or more** stays in a State or county correctional facility in the State of Illinois within the most recent 12-month period ; or  . . ..

[3] "Major adverse reaction" means collapse or shock, high pitched screaming, persistent crying for **three or more** hours, excessive somnolence (sleepiness) . . ..

[4] "An individual shall be ineligible for benefits whenever, in any period commencing with a compensable week of unemployment, he has been allowed his full weekly benefit amount for each of twenty-six weeks, until he has earned wages equal to **at least three times** his current weekly benefit amount in bona fide work, reduced by an amount equal to his current weekly benefit amount for each week, if any, in which he was not unemployed within such period, whereupon he shall again, if otherwise eligible, be permitted to receive his full weekly benefit amount for twenty-six weeks.  If, however, a compensable week of unemployment is followed by **three or more** weeks (not necessarily consecutive) in each of which he earned wages for bona fide work equal to at least his then current weekly benefit amount

term "repeatedly" or rule as to the number of violations necessary to satisfy the repeated requirement. That court did, however, note that the threshold, whatever it may be, certainly would have been met by the specific facts of the case; the court did not say that there being three violations was the reason for the threshold being met, nor has any other Illinois court made such a determination. *Id.*

19. Other courts interpreting the word "repeated" or "repeatedly" have ruled that it means "more than once." *See* George Hyman Const. Co. v. Occupational Safety & Health Rev. Comm'n, 582 F.2d 834, 839 (4th Cir. 1978) ("Under the circumstances we think a more common usage of the term connotes only that a single prior infraction need be proven to invoke the repeated violation sanction authorized by the [Occupational Health & Safety] Act."); Bunge Corp. v. Sec'y of Lab., 638 F.2d 831, 837 (5th Cir. 1981) ("This Court holds that when the same standard is violated more than once, it is a repeated violation if there is substantial similarity of violative elements."); State ex rel. Cloud v. Schnell, No. A23-1215, 2024 WL 1251691, at *4 (Minn. Ct. App. Mar. 25, 2024) ("Defining 'repeatedly' to mean 'more than once' is reasonable under the plain meaning rule and in view of the word's derivation from 'repeat.'"); State v. Collins, 580 N.W.2d 36, 41 (Minn. Ct. App. 1998) ("Most states that have considered the issue have defined "repeatedly" to mean "more than once.") *See, e.g.,* State v. Saunders, 886 P.2d 496, 497 (Okla. Crim. App.1994); People v. Heilman, 25 Cal.App.4th 391, 400 (Cal. Ct. App.1994); State v. Culmo, 642 A.2d 90, 98 (Conn. Super. Ct.1993); United States v. Smith, 685 A.2d 380, 385 (D.C.1996), *cert. denied,* 522 U.S. 856, (1997); State v. Randall, 669 So.2d 223, 227 (Ala. Crim. App.1995); State v. Martel, 902 P.2d 14, 19 (Mont. 1995).

20. For all the foregoing reasons, TUPSS submits that the Court should find that TUPSS had "good cause" to terminate the franchise agreement under the most reasonable

interpretation of 815 ILCS 705/19 even if there were only two instances where the Debtor failed to comply with the franchise agreement. But the Court does not have to reach that issue here because the Debtor failed to comply with the franchise agreements in far more than two instances. As set forth in specific detail in TUPSS' Objection, the Debtor committed an excessive number of material breaches of multiple different lawful provisions of the Franchise Agreements, monetary and otherwise, between June 2023 and the ultimate termination on March 16, 2024 (collectively, the "Prepetition Breaches"). *See* Objection at ¶¶ 14-19. The Prepetition Breaches included, but were not limited to, at least two violations of §12.4(a), at least two violations of sections § 5.4(a), and at least two violations of § 5.2(b) – any of which were sufficient for termination under the Franchise Agreements under § 12.4(h)

21.  Even putting aside the two breaches that the Debtor has chosen to highlight as insufficient for "good cause" under the Act, any number of the Prepetition Breaches, taken in combination, provide a sufficient "good cause" basis for TUPSS to terminate the Franchise Agreements "without the requirement of notice and an opportunity to cure" as the IFDA provides. *See* IFDA at § 19(c)(4).

22.  The Debtor also mistakenly reads § 19(c)(4) of the IFDA to only be applicable when identical breaches have occurred on multiple occasions. Stated differently, the Debtor argues that "good cause" exists only when the franchisee fails to comply with a specific lawful provision of the Franchise Agreement, then fails to comply with that same specific lawful provision of the Franchise Agreement again, and—applying the Debtor's later argument around the numerosity required of "repeatedly"—fails to comply with that same specific lawful provision of the franchise agreement again. This is both an incorrect reading and also fails to take into account that the Illinois Legislature did not limit the definition of "good cause" solely to those examples given in

9

the Act. *See* ILDA at 815 ILCS 705/19(b) ("'Good cause' shall include, but not be limited to, . . ..") and at 815 ILCS 705/19(c) ("'Good cause' shall include, but not be limited to, . . ..").

23. However, Debtor's narrow reading that terminable breaches must be identical and repeated is not what the Act states or requires. In § 19(c)(4) the word "repeatedly" modifies a "fail[ure] to comply with the lawful provisions of the franchise [] agreement." Good cause exists regardless of which lawful provisions of the franchise agreement were breached and there is no requirement it be the exact same provision breached multiple times. As the Objection clearly details, the Debtor repeatedly failed to comply with numerous and varied lawful provisions of the Franchise Agreements – so many that "good cause" for termination without notice or cure opportunity clearly existed regardless of whether "repeatedly" requires more than two occurrences (which, as discussed, it does not).

24. Furthermore, for purposes of determining whether TUPSS violated the IFDA by terminating the franchise agreement it is irrelevant whether TUPSS previously gave notice of each of the Debtor's failures. Indeed, the IFDA expressly addresses the situation where a franchisor does not give notice or an opportunity to cure—and provides that a franchisor still had good cause to terminate if the franchisee's failures to comply are "repeated." This district, as well as, the 7th Circuit has held that a party maintains its "right to exercise its contractual rights in the event of breach even after that party continued to work with the breaching party." *See* Honeywell Int'l, Inc. v. Automated Bldg. Controls*, LLC*, No. 16 C 6828, 2016 WL 5349462, at *9 (N.D. Ill. Sep. 22, 2016) (citing McElroy v. B.F. Goodrich Co., 73 F.3d 722, 724-25 (7th Cir. 1996). Therefore, the mere fact TUPSS did not provide notice upon each of the Debtor's Prepetition Defaults does not mean that TUPSS lacked "good cause" when it eventually terminated the Franchise Agreements. *See id.*

DMS_US.363928177.7

### C. TUPSS' Setoff Right Is Permissive and Conditional

25. Section 5.6 of the Franchise Agreements require that "[a]ll payments required hereunder shall be made by Franchisee without deducting any amounts that (i) are owed by TUPSS to Franchisee, or (2) that Franchisee believes are owed by Franchisee by TUPSS or by any Affiliate of TUPSS."

26. Section 5.7 of the Franchise Agreement sets forth TUPSS' setoff right:

> If Franchisee is delinquent in the payment of any obligation to TUPSS hereunder, or under any other agreement with TUPSS, TUPSS shall have the absolute right to apply any payments received from Franchisee to any obligation owed, whether under this Agreement or otherwise, notwithstanding any contrary designation by Franchisee as to application. If Franchisee (or any Affiliate of Franchisee) owes any monies to TUPSS (or any Affiliate of TUPSS), TUPSS shall have the absolute and unconditional right to first deduct any or all of such amounts from any payments of monies owed by TUPSS (or owed by any Affiliate of TUPSS) to Franchisee (or to any Affiliate of Franchisee).

Sections 7.5(c) & (d) of the Franchise Agreement further clarifies the Debtor's duty and TUPSS' right:

> c. Franchisee agrees to remain financially current with all obligations to TUPSS. At TUPSS' election, TUPSS may apply any sums owed Franchisee under the Corporate Retail Solutions (CRS) Program against any sums owed to TUPSS by Franchisee, including Royalties, The UPS Store Marketing Fees, and National Advertising Fees.
>
> d. All CRS transactions must be entered into the POS Systems at the time of the transaction, or as otherwise designated by TUPSS, in order to qualify for CRS payment. TUPSS will use best efforts to remit such funds to Franchisee within twenty (20) days after the last day of the month in which the report of the transaction was received by TUPSS, where Franchisee has not already received payment directly.

27. At the time of entry into the Franchise Agreements, the Debtor and TUPSS (and, where relevant, other third-party Clients) entered into various agreements related to the Debtor's obligations to clients of TUPSS and for whom TUPSS had secured benefits for its franchisees. These agreements include, but were not limited to, the Debtor agreeing to process certain transactions for third party Clients and for which the Debtor would be entitled to payments either

11

directly from the Client or, where Client payments were aggregated across multiple TUPSS franchises and made directly to TUPSS, then paid from TUPSS to each franchisee via Program Revenue Payments (PRP). *See* TUPSS Center Operation Manual – Finance ("COM-Finance") at § II.B.2 (attached hereto as Ex. A). TUPSS negotiated with the Clients to ultimately create the various PRPs from which the franchisees benefit and TUPSS continues to negotiate with current and prospective Clients to secure favorable terms for its franchisees. The TUPSS COM – Finance provides that

> TUPSS will use best efforts to remit funds for all CRS Client-paid transactions (i.e., transactions where the Franchisee has not already received payment directly from an End User) to the Franchisee via Program Revenue Payments (PRP) within twenty (20) days after the last day of the month in which the report of the transaction was received by TUPSS.
>
> Franchisees must report as commissions on the Royalty Report only the amount of the PRP identified as commissions on the PRP statement. For instructions on reporting PRP, Franchisees may refer to the Point of Sale (POS) System Quick Reference Guides page of The UPS Store® Hub.

### D.    **TUPSS Had No Duty of Setoff**

28.    The Debtor argues that TUPSS was obligated to perform a proactive setoff of PRP amounts claimed by Old National Bank and IOU Financial against unpaid royalties, marketing, and national media fees (the "Franchise Fees"); however, that stands in direct contradiction to the clear and unambiguous language of the Franchise Agreements. *See* Schweihs v. Chase Home Fin., LLC, 77 N.E.3d 50, 64 (Ill. 2016) ("a written contract is the highest evidence of the terms of an agreement between the parties to it"); Hawkins v. Capital Fitness, Inc., 2015 IL App (1st) 133716, ¶ 14, 29 N.E.3d 442 (recognizing that the act of signing legally signifies that the individual had an opportunity to become familiar with and comprehend the terms of the document he or she signed).

29. The language providing for TUPSS' right of setoff under the Franchise Agreements and ancillary documents demonstrate the clear intention of the parties that this setoff right was permissive and not mandatory. Section 5.7 of the Franchise Agreements gives TUPSS the "*absolute and unconditional right to apply* any payments received from Franchisee" to amounts purportedly owed to the Debtor (emphasis added); while § 7.5(c) makes clear that any setoff is purely "at TUPSS' election, TUPSS may apply any sums owed Franchisee." TUPSS' setoff right is never mandatory to apply, at most TUPSS is required to "use best efforts" under the Franchise Agreements.

30. The Debtor, on the other hand, clearly had a mandatory obligation to make payment of the Franchise Fees to TUPSS. *See* Franchise Agreements at §§ 5.6 and 7.5(c) ("All payments required hereunder shall be made by Franchisee" and "Franchisee agrees to remain financially current with all obligations to TUPSS"). "[A] debtor violates its legal duty if it fails to pay a debt when due even though the creditor owes the debtor a larger, fully liquidated sum." *Williston on Contacts* (4th ed.) at § 44.35.

31. The Debtor seeks to impose an equitable duty on TUPSS, requiring that it force a prepetition setoff, citing to Chicago Title & Tr. Co. v. Exch. Nat. Bank of Chicago, 312 N.E.2d 11 (Ill. App. Ct. 1974), a case involving an equitable setoff in the case of a foreclosure by a mortgagee. *See also*, Wells Fargo Bank, N.A. v. Toy, 2011 IL App (1st) 111355-U, ¶ 27 (Ill. App. Ct. 2011) (examining *Chicago Title* and citing it employed "equitable reasoning.").

32. As the 7th Circuit discusses in Coplay Cement Co. v. Willis & Paul Grp., 983 F.2d 1435, 1441 (7th Cir. 1993), "[a]lthough the doctrine of setoff has an equitable lineage . . . it was grafted onto the common law by statute in the eighteenth century. By the time it turned into the permissive counterclaim, it had lost all its equitable foliage—had become, so far as it retained any

13

doctrinal form at all, a purely procedural doctrine. Only in banking and in bankruptcy, the two contexts in which as we said setoff retains its substantive or remedial distinction, do equitable considerations sometimes surface."

33. In the instant matter, TUPSS was under no contractual obligation to perform a setoff due to the permissive language of the Franchise Agreements and no equitable means should seek to re-write the past. The Debtor's proper avenue for seeking the benefit of the mutual debts is through an objection with potential partial defense to a TUPSS' proof of claim in the Chapter 11 Case or via an adversary proceeding. There is however no proper scenario or available legal doctrine whereby the Debtor can now seek to "unscramble the egg" and revive the properly terminated Franchise Agreements.

## **CONCLUSION**

A review of common usage, statutory interpretation, and persuasive judicial opinions clearly show that the definition of "repeatedly" in the Act is "more than one." Nonetheless, the Debtor violated the lawful terms of the Franchise Agreements on many more than two occasions. The number of these material violations are more than sufficient to provide TUPSS with "good cause" for termination under the Franchise Agreement and the Act. Accordingly, the facts as included in the Objection sufficiently satisfy the statutory requirement of "repeated" violations of the Franchise Agreements for TUPSS to terminate with or without notice and time to cure.

TUPSS had no duty, either contractually or equitably, to perform a prepetition setoff of franchise fees and PRPs and the Debtor's failure to make its franchise fee payments provided one of many sufficient bases for a finding of good cause to terminate the Franchise Agreements. In addition, the Debtor's non-monetary defaults (which could not be remedied via setoff) also provided more than ample justification for the termination.

**WHEREFORE**, TUPSS respectfully requests that this Court enter an order denying the Debtor's Stay Motion.

Dated:   May 21, 2024                          THE UPS STORE, INC.

                                                By: */s/ Michael T. Gustafson*
                                                Michael T. Gustafson
                                                FAEGRE DRINKER BIDDLE & REATH LLP
                                                320 South Canal Street, Suite 3300
                                                Chicago, IL 60606
                                                Telephone: (312) 569-1000
                                                Facsimile: (312) 556-3000
                                                Emails: mike.gustafson@faegredrinker.com

                                                *Counsel to The UPS Store, Inc.*