**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE NEELY GROUP, INC., | ) | No. 24 B 3859 |
| | ) | |
| Debtor. | ) | Judge Goldgar |

## **MEMORANDUM OPINION**

Before the court for ruling in this chapter 11 case is the motion of debtor The Neely

Group, Inc. ("Neely") to enforce the automatic stay against The UPS Store, Inc. ("UPS").  Neely

was a UPS franchisee and operated two UPS Stores in Chicago.  On March 15, 2024, UPS

notified Neely that it was terminating the franchises effective the next day.  On March 18, 2024,

Neely filed its chapter 11 petition and then moved for sanctions against UPS, claiming the

termination violated the automatic stay in 11 U.S.C. § 362(a).

For the reasons below, Neely's motion will be denied.

### **1.  Jurisdiction**

The court has subject matter jurisdiction under 28 U.S.C. § 1334(a) and the district

court's Internal Operating Procedure 15(a).  This is a core proceeding.  28 U.S.C. §§

157(b)(2)(A), (O); *N. Parent, Inc. v. Cotter & Co. (In re N. Parent, Inc.)*, 221 B.R. 609, 627

(Bankr. D. Mass. 1998) (franchisee's claim that terminating franchise violated the stay was

core).

### **2.  Facts**

The sparse facts come from the parties' papers, from other motions in the case, and from

the court's docket.  The court can take judicial notice of information in its own docket.  *In re*

*Gomez*, 655 B.R. 738, 740 (Bankr. N.D. Ill. 2023).  No facts are in dispute.

### a. Neely's UPS Store Franchises

UPS is a franchisor with 5,250 franchised "UPS Store" centers in the United States. Each center provides customers with packaging, shipping origination (with shipping through affiliate United Parcel Service), mailbox, and other services.  Each franchisee independently owns and operates its location.  Some franchisees operate more than one location.

In October 2022, Neely and UPS entered into franchise agreements under which Neely would operate two UPS Stores, one on Milwaukee Avenue and the other on California Avenue, both in Chicago.  The identical agreements had ten-year terms with an option to renew.

### b. The Franchise Agreements

Three sections of the extensive 68-page franchise agreements spelled out the parties' rights and responsibilities relevant here.  Section 5.1 required Neely to pay UPS several fees, including an initial franchise fee, a continuing royalty, a marketing fee, a national advertising fee, and an advertising cooperative fee.  Section 5.4 required Neely to make each payment owed to UPS "promptly when due."  And section 5.6 declared that all payments had to be made "without deducting any amounts that (i) are owed by [UPS] to [Neely], or (ii) that [Neely] believes are owed to [Neely] by UPS or by any Affiliate of [UPS]."

Several sections of the franchise agreements addressed default and termination.  In particular, section 12.4 provided:

> Subject to any controlling Applicable Laws to the contrary,
> [Neely] shall be deemed to be in material default and [UPS] may,
> at its option, terminate this Agreement and all rights granted
> hereunder, without affording [Neely] any opportunity to cure the
> default, effective immediately upon delivery or attempted delivery

> to [Neely] of notice by [UPS] of the occurrence of any of the
> following events: . . . .
>
> h.  if [Neely] . . . fails on 2 or more separate occasions within any
> period of 12 consecutive months to comply with the same
> obligation under this Agreement, whether or not such breaches
> shall have been curable or cured after receipt of notice . . . .

Section 19 discussed notices, declaring notices (and so notices of default) ineffective "unless in writing and delivered to the party entitled to receive them in accordance with this Section 19."  Section 19 continued: "All . . . notices . . . will be deemed delivered at the time delivered by hand; or one (1) business day after deposit with a nationally-recognized commercial courier service for next business day delivery; or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid."

Section 20.1.a, finally, provided (with exceptions not relevant here):  "This Agreement . . . shall be governed and construed under and in accordance with the laws of the State of California, without regard to any choice of law analysis, rules, or principles thereof, to the extent such rules or principles would direct a matter to another jurisdiction."

### c.  Other Agreements

The franchise agreements were not the only agreements between Neely and UPS.  There were others.  Under some, UPS had to make payments to Neely.  UPS describes these agreements in its papers as agreements "to process certain transactions for third party Clients and for which [Neely] would be entitled to payments either directly from the Client or, where Client payments were aggregated across multiple . . . franchises and made directly to [UPS], then paid from [UPS] to each franchisee via Program Revenue Payments (PRP)."

### d. Neely's Default and UPS's Termination

Neely failed to pay UPS amounts due under the franchise agreements. On January 12, 2024, UPS sent Neely notices that it had past due balances of $7,637.38 for one franchise and $23,753.20 for the other, and UPS was terminating the franchises unless the defaults were cured within 30 days. Neely cured both defaults, but the cures were short-lived. As of March 14, 2024, Neely had past due balances of $22,679.99 for one franchise and $22,925.65 for the other. So on March 15, 2024, UPS sent Neely notices by email and overnight delivery that the franchises would terminate on March 16, 2024. This time, UPS gave Neely no chance to cure the defaults, citing section 19(c)(4) of the Illinois Franchise Disclosure Act of 1987 and asserting that Neely had "repeatedly" failed to abide by the franchise agreements.

As of March 14, 2024, UPS owed Neely $177,772.69 in Program Revenue Payments.

### e. The Bankruptcy Case and Neely's Motion

On March 18, 2024, Neely filed a petition under chapter 11 of the Bankruptcy Code.[1] UPS then cut off Neely's access to its shipping and mailbox rental software and from UPS proprietary hardware. Weeks later, Neely moved to enforce the stay against UPS and sought sanctions. According to Neely, UPS had no right to terminate the franchise agreements, and even if it did, it had not terminated them before Neely sought bankruptcy protection on March 18. UPS opposes the motion.

---

[1]     Neely's president signed and filed the petition himself, violating the rule that "corporations must appear by counsel or not at all." *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir. 1985). Counsel appeared for Neely days later. A pro se corporate bankruptcy filing can be corrected through counsel's appearance, and the correction will relate back to the original filing date. *In re IFC Credit Corp.*, 663 F.3d 315, 321 (7th Cir. 2011).

-4-

### 3. Discussion

Neely's motion will be denied.  There was no stay violation.  UPS had cause to terminate the franchise agreements under the agreements' terms and applicable law; it terminated them in the way the agreements required; and the termination was effective before March 18.

The automatic stay in section 362(a) of the Bankruptcy Code halts various creditor actions against the debtor, the debtor's property, and property of the estate during the bankruptcy case.  11 U.S.C. § 362(a); *see Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 755-56 (9th Cir. 1995).  The stay is "one of the fundamental debtor protections provided by the bankruptcy laws," *Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 503 (1986) (internal quotation omitted), because it preserves the estate and gives the debtor some respite from creditors, *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011).

A debtor's franchise agreement is generally considered property of the debtor's bankruptcy estate, at least when the agreement has not been terminated.  *In re Tornado Pizza, LLC*, 431 B.R. 503, 510 (Bankr. D. Kan. 2010); *In re Motorcycle Excellence Grp.*, 365 B.R. 370, 377 (Bankr. E.D.N.Y. 2006).  Because it is estate property, a franchisor's post-petition termination of a franchise agreement violates the stay.  *In re Joyner*, 46 B.R. 130, 135 (Bankr. M.D. Ga. 1985).  If the agreement was terminated prepetition, on the other hand, it does not become estate property, *Tornado Pizza*, 431 B.R. at 510; *Motorcycle Excellence*, 365 B.R. at 377; *In re Tudor Motor Lodge Assocs., L.P.*, 102 B.R. 936, 948 (Bankr. D.N.J. 1989), and its termination cannot have implicated the stay.

UPS properly terminated the franchise agreements.  Neely failed to pay what it owed UPS under section 5 not once but twice.  Under section 12.2, Neely's failures to pay breached the agreements.  The first failure was "good cause" for termination under section 19(b) of the

Illinois Franchise Disclosure Act of 1987, 815 ILCS 705/19(b) (2022).  Because Neely failed to pay again within a twelve-month period, section 12.4.h of the franchise agreements allowed UPS to terminate the agreements without notice or an opportunity to cure.  The second failure was also "good cause" under section 19(c)(4) of the Illinois Act, 815 ILCS 705/19(c)(4) (2022), and that section likewise allowed UPS to terminate without notice or an opportunity to cure. Although no notice of the termination was necessary, UPS did give notice, sending Neely letters on March 15, 2024, by email and overnight delivery that the agreements would terminate at the close of business the next day, March 16.  Neely did not file its bankruptcy case until March 18. That meant the termination occurred prepetition, not post-petition, and so did not violate the automatic stay.  *Tornado Pizza*, 431 B.R. at 510-11.

Neely disagrees, suggesting two reasons why UPS could not terminate the agreements. Citing *Chicago Title & Tr. Co. v. Exchange Nat'l Bank of Chi.*, 19 Ill. App. 3d 595, 312 N.E.2d 11 (2d Dist. 1974), Neely argues, first, that the agreements could not be terminated because UPS owed Neely more than Neely owed UPS, and UPS had to setoff its own obligations to Neely before declaring Neely in default.

*Chicago Title* is no help to Neely.  The case arose out of a real estate sale.  The buyers agreed to pay the mortgagee-seller in installments; the seller, in turn, agreed to fix the property's leaky basement.  When the seller failed to fix the leak, the buyers hired a plumber and then deducted the plumber's fee from the first installment due the seller.  The seller sued to foreclose on its mortgage, contending the buyers could not set off the amount they were due against the first installment they owed.  But the appellate court disagreed, finding "[t]here is no default which would permit the mortgagor to accelerate the maturity of the debt when there is a set-off available which is equal to or exceeds the amount of indebtedness due at the time of the default."

-6-

*Id.* at 567, 312 N.E.2d at 14.  The court explained:  "The rule is based on the reasoning that it would be inequitable to permit one by his own act to cause a partial failure of the consideration for the mortgage without requiring him to credit the amount of such failure upon the indebtedness for the purchase price of the property."  *Id.*

As the court's analysis suggests, *Chicago Title* was an equitable decision, not a contractual one.  *See Wells Fargo Bank, N.A. v. Toy*, No. 1-11-1355, 2011 WL 10099277, at *5 (Ill. App. Ct. 1st Dist. Dec. 14, 2011) (discussing *Chicago Title* and its "equitable rule").  Not only did *Chicago Title* concern a mortgage foreclosure, but so did every decision the court relied on for its conclusion that the buyers were not in default.  *See State Bank of St. Charles v. Burr*, 372 Ill. 114, 22 N.E.2d 941 (1939); *Dunlap v. Peirce*, 336 Ill. 178, 168 N.E. 277 (1929); *Northern Trust Co. v. Sanford*, 308 Ill. 381, 139 N.E. 603 (1923); *Mason v. Griffith*, 281 Ill. 246 (1917); *Smith v. Niemann*, 216 Ill. App. 179 (1919); *Schmisseur v. Penn*, 47 Ill. App. 278 (1892).  A mortgage foreclosure proceeding in Illinois is a proceeding in equity.  *PNC Bank, N.A. v. Wilson*, 74 N.E.3d 100, 107 (Ill. App. Ct. 2d Dist. 2017).[2/]

The question here, on the other hand, is contractual.  Under settled contract law, "when a debtor owes a creditor a specific sum . . . , the debtor will not be excused from the obligation to pay regardless of any breach of duty by the creditor.  And this is true even though there are mutual obligations which are both liquidated debts."  15 Richard A. Lord, *Williston on Contracts* § 44.34 at 171 (4th ed. 2014); *see also Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064,

---

[2/]  The California Supreme Court (whose decisions apply here, along with the rest of California law, under the franchise agreements' choice-of-law provision) reached the same conclusion in *Hauger v. Gates*, 42 Cal. 2d 752, 269 P.2d 609 (1954), a mortgage foreclosure case.  Mortgage foreclosures in California are also proceedings in equity.  *See Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89, 112, 134 Cal. Rptr. 622, 640 (2011).

1066 (7th Cir. 1987).  For mutual liquidated debts to cancel each other, an "agreement of the parties or judicial action" is necessary, Lord, *supra*, at § 44.34 at 171; *Schieffelin*, 823 F.2d at 1066, and here there is neither.  To the contrary, section 5.6 of the franchise agreements said that Neely had to pay UPS "without deducting any amounts that (i) are owed by [UPS] to [Neely], or (ii) that [Neely] believes are owed to [Neely] by UPS or by any Affiliate of [UPS]."  So even if *Chicago Title*'s setoff rule were relevant here, UPS and Neely contracted out of it.

Neely's second reason why UPS could not terminate the franchise agreements is that the Illinois Act limited UPS's termination rights.  Under section 19(c)(4) of the Illinois Act, UPS could terminate the franchise agreements with no opportunity to cure if Neely had "repeatedly fail[ed] to comply with the lawful provisions of" the agreements.  815 ILCS 705/19(c)(4) (2022).  By defaulting only twice, Neely says, it had not "repeatedly" failed to comply.[3/]

Neely's position has some force.  The definitions section of the Illinois Act does not define "repeatedly," *see* 815 ILCS 705/3 (2022), and the only judicial decisions on the term's meaning declined to reach the question, *see Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992); *Pearle Vision, Inc. v. Romm*, No. 04 C 4349, 2005 WL 2172393, at *6 (N.D. Ill. Sept. 1, 2005).  But dictionaries, a source Illinois courts often consult when statutes leave terms undefined, *see, e.g., People v. Hutt*, 220 N.E.3d 1088, 1098 (Ill. 2023), say "repeatedly" means "again and again," the interpretation Neely advances, *see Oxford English Dictionary* 462 (1979); *American Heritage Dictionary* 1530 (3d

---

[3/]     The Illinois Act applies despite the choice-of-law provision in the franchise agreements because section 19(a) makes it a violation for "a franchisor to terminate a franchise of a franchised business located in this State" without "good cause."  815 ILCS 705/19(a) (2022).  Neely's franchises are located in Illinois.  UPS concedes that the Illinois Act applies here.

ed. 1996).  Defaulting twice is not defaulting "again and again."

The problem for Neely is that these same dictionaries also define "repeatedly" to mean "more than once," UPS's interpretation.  *Id.*  The conflicting (indeed, internally inconsistent) dictionary definitions strongly suggest the term is ambiguous, *see Illinois Marine Towing, Inc. v. Barnick (In re Barnick)*, 353 B.R. 233, 240 (Bankr. C.D. Ill. 2006), because it is "capable of being understood . . . in two or more different ways," *People v. Reyes*, 231 N.E.3d 84, 92 (Ill. 2023); *see Commonwealth v. Wotan*, 422 Mass. 740, 742-43, 655 N.E.2d 976, 977-78 (1996) (noting the different dictionary definitions and finding "repeatedly" ambiguous).  When a statute is ambiguous, Illinois courts consider "extrinsic aids of construction, such as legislative history, to discern the legislative intent."  *Reyes*, 231 N.E.3d at 92.  But the Illinois Act's legislative history never mentions "repeatedly."[4/]  Based solely on the dictionary definitions, then, Neely's take on "repeatedly" is as plausible as UPS's – but no more plausible.

Fortunately, the structure of the statute breaks the interpretive tie.  When a statute is ambiguous and legislative history offers no guidance, Illinois courts resolve conflicting meanings by examining the statute as a whole.  *See Reyes*, 231 N.E.3d at 92.  Construing "repeatedly" to mean "more than once" is more consistent with the structure of section 19.  Section 19(a) bars the termination of a franchise except for "good cause."  815 ILCS 705/19(a) (2022).  Sections 19(b) and (c) then explain what "good cause" means.  Under section 19(b),

---

[4/]     Another possible extrinsic aid – comparable statutes from other states, *see* 2B Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 52:3 at 351 (7th ed. 2012) – also fails to advance the interpretive ball.  Arkansas, Iowa, and California also have franchise statutes with termination provisions that use the term "repeated" or "repeatedly."  Ark. Code Ann. § 4-72-204(d) (2023) ("repeated"); Iowa Code Ann. § 537A.10.7(c)(6) (West 2021) ("repeatedly"); Cal. Bus. & Prof. Code § 20021(g) (Deering 2023) ("repeatedly").  None of those statutes defines the term, and no reported judicial decision from those states discusses its use.

"good cause" means the franchisee's failure to comply with the franchise agreement – and to cure the default after notice and an opportunity to cure.  815 ILCS 705/19(a) (2022).  Under section 19(c)(4), "good cause" means "repeatedly" failing to comply, in which case no notice or opportunity to cure is necessary.  815 ILCS 705/19(c)(4) (2022).  The statutory possibilities, in other words, are (1) defaulting once and (2) defaulting "repeatedly."  So "repeatedly" must mean more than once.  Otherwise, the statute's coverage would have a gap:  the possibility of two defaults.[5]

Had the General Assembly wanted section 19(c) to apply only after three or more franchisee defaults, it could have said so.  The General Assembly knows how to say something must happen (or must have happened) "three or more" times when it wants to.  *See, e.g.,* 70 ILCS 210/25.5(c) ("3 or more times"); 215 ILCS 5/143.19.1(e)(5) (2022) ("3 or more violations"); 240 ILCS 40.15-20 (2022) ("3 or more violations"); 405 ILCS 125/3(1) (2022) ("three or more psychiatric inpatient hospital admissions"); 430 ILCS 66/15(b) (2022) ("3 or more arrests"); 625 ILCS 5/18c-5303(1)(d)(ii) (2022) (convicted "on 3 or more occasions"); 720

---

[5]       As UPS notes, most courts have held "repeatedly" to mean "more than once" rather than "again and again."  *See, e.g., J.L. Foti Const. Co. v. Occupational Safety & Health Rev. Comm'n*, 687 F.2d 853, 856 (6th Cir. 1982); *Bunge Corp. v. Secretary of Lab.*, 638 F.2d 831, 837 (5th Cir. 1981); *Todd Shipyards Corp. v. Secretary of Lab.*, 586 F.2d 683, 686 (9th Cir. 1978); *George Hyman Const. Co. v. Occupational Safety & Health Rev. Comm'n*, 582 F.2d 834, 839 (4th Cir. 1978) (calling "strained" the contention that it means "again and again"); *United States v. Louis*, No. 6:05-cv-1919-Orl-28KRS, 2006 WL 4835921, at *3 (M.D. Fla. Sept. 8, 2006); *State v. Randall*, 669 So. 2d 223, 227 (Ala. Crim. App. 1995) (finding "more than once" to be "the ordinary and common meaning"); *State v. McCarthy*, 294 Mont. 270, 274, 980 P.2d 629, 632 (1999) (declaring this the "commonly understood meaning[ ]"); *People ex rel. VanMeveren v. County Court*, 191 Colo. 201, 205, 551 P.2d 716, 720 (1976); *State v. Collins*, 580 N.W.2d 36, 42 (Minn. Ct. App. 1998) (finding this interpretation "reasonable under the plain meaning rule and in view of the word's derivation from 'repeat'").  *Wotan* reached the opposite conclusion after finding the term ambiguous, but only because criminal statutes are construed "strictly against the Commonwealth," and "the defendant is given the benefit of the ambiguity."  *Wotan*, 422 Mass. at 742, 665 N.E.2d at 977-78.  The Illinois Act is not a criminal statute.

ILCS 5/17-8.5(b) (2022) (committing fraud "3 or more times"); 815 ILCS 505/2E (2022) ("3 or more violations").  It did not say so in section 19.  In defaulting twice, then, Neely "repeatedly" defaulted and gave UPS "good cause" under section 19(c)(4) to terminate the franchises without allowing Neely another chance to cure.[6]

Finally, Neely argues that even if UPS could terminate the franchise agreements, the termination occurred post-petition.  UPS gave notice of the termination by overnight delivery on March 15, and under section 19 of the franchise agreements the notice was effective "one business day" later.  But March 16, 2024, was a Saturday, and under Illinois law the time for an act to be done is computed by including the last day "unless the last day is Saturday."  5 ILCS 70/1.11 (2022).  That made the next business day March 18, and Neely filed its petition on March 18.

Once more, though, Neely runs up against the choice-of-law provision that makes California law, not Illinois law, applicable here.  Section 7 of the California Civil Code provides: "Holidays . . . are every Sunday and such other days as are specified or provided for as holidays in the Government Code."  Cal. Civ. Code § 7 (Deering 2005).  Section 6700(a) of the California Government Code, in turn, lists "[t]he holidays in this state."  Cal. Gov't Code § 6700(a)

---

[6]      UPS contends that Neely defaulted many times, not just twice.  Neely resists this contention, partly because UPS gave notice of only two defaults, so UPS cannot now "mend its hold" and claim others. *See Estate of Burford v. Accounting Prac. Sales, Inc.*, 851 F.3d 641, 644 (7th Cir. 2017) (describing the Illinois "mend-the-hold" doctrine that prevents a party to a contract dispute from "trying to change its position or theories at such a late stage in the dispute as to cause unfair prejudice to the opposing party").  The "mend-the-hold" doctrine is unavailable here, though.  The franchise agreements say California law governs, and California has not adopted the doctrine. *Street Surfing, LLC v. Great Am. E & S Ins. Co.*, 776 F.3d 603, 609 n.6 (9th Cir. 2014).  A better reason not to consider other defaults is that doing so is needless.  The two undisputed defaults gave UPS all the "good cause" it needed to terminate the franchise agreements without an opportunity to cure.

(Deering 2024). The list includes "every Sunday," as well as a variety of well-known holidays (Christmas Day, Good Friday, Veterans Day, and so on). *Id.* It does not include Saturdays. *Id.* Section 9 of the Civil Code declares that "[a]ll other days than those mentioned in Section 7 are business days for all purposes." Cal. Civ. Code § 9 (Deering 2005). Under California law, then, Saturdays are business days. *Gans v. Smull*, 111 Cal. App. 4th 985, 989-90, 4 Cal. Rptr. 3d 353, 356-57 (2003). UPS's termination of the franchise agreements was therefore effective on Saturday, March 16, two days pre-petition, not March 18, the petition date. There was no stay violation.[7]

Because UPS had "good cause" to terminate its franchise agreements with Neely, and because UPS terminated the agreements before Neely filed its petition, Neely's motion to enforce the automatic stay will be denied.

### 4. Conclusion

The motion of The Neely Group, Inc. to enforce the automatic stay and sanction The UPS Store, Inc. is denied. A separate order will be entered in accordance with this opinion.

Dated: June 11, 2024

_____
A. Benjamin Goldgar
United States Bankruptcy Judge

---

[7] Even if the termination did not occur until March 18, arguably there was still no stay violation. If UPS's notices of termination were not effective on March 16 (or March 17, a Sunday), presumably they became effective at 12:01 a.m. on March 18. The court's docket shows that Neely did not file its petition until 9:13 a.m. on March 18, more than nine hours later.

-12-